GULF & WESTERN INDUSTRIES, INC., Plaintiff,

v.

The GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., Defendant and Third-Party Plaintiff,

v.

Charles G. BLUHDORN and Kidder Peabody & Co., Inc., Third-Party Defendants.

No. 73 Civ. 536.

United States District Court, S. D. New York.

Feb. 13, 1973.

Simpson, Thacher & Bartlett, New York City, for plaintiff and third-party defendant Bluhdorn; Whitney North Seymour, William S. Manning, Melvyn L. Cantor, George H. Hempstead, III, Luin P. Fitch, Jr., Cynthia M. Cohen, and John A. Guzetta, New York City, of counsel.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for defendant; D. G. McInerney, R. L. Falls, W. T. Lifland, H. L. Bisgaier, and C. Platto, New York City, of counsel.

Sullivan & Cromwell, New York City, for Kidder Peabody & Co., Inc.; William E. Willis and Mark I. Fishman, New York City, of counsel.

## OPINION

DUFFY, District Judge.

The plaintiff, Gulf & Western Industries, Inc. (hereinafter referred to as G & W), is one of the biggest of the conglomerates which now is to be found on our national and international scene. Charles G. Bluhdorn, a third party defendant, is the Chairman of the Board, Chief Executive Officer, and guiding genius of G & W.

The defendant and third party plaintiff, The Great Atlantic and Pacific Tea Company, Inc. (hereinafter referred to as A & P), is one of the largest retail food chains in the country.

This action revolves around a tender offer by G & W for 15% of the outstanding shares of A & P. Kidder Peabody & Co., Inc. (hereinafter referred to as Kidder Peabody), the other third party defendant, is a broker-dealer and investment banker which was engaged by G & W as manager of the tender offer.

In this action, G & W claims that A & P in press releases and communications with its shareholders, has made false statements, either directly or by omitting material facts, which statements are violative of the Securities Exchange act of 1934. G & W, therefore, has asked this Court for a preliminary and permanent injunction against A & P for these alleged violations.

A & P, in its verified answer and counterclaim, has denied G & W's charges and also seeks a preliminary and permanent injunction against G & W, Bluhdorn and Kidder Peabody. A & P claims that the acquisition by G & W of the A & P shares covered by the tender offer would be a violation of the antitrust laws; that G & W's activity in acquiring shares of A & P through Kidder Peabody prior to the tender offer was in violation of the Securities Exchange Act of 1934; and that in the tender offer G & W has made untrue statements of material facts and has omitted to state material facts so as to constitute fraud within the meaning of the Securities Exchange Act of 1934.

Before discussing the various charges of the parties it is necessary to set out some facts as background so that the various allegations may be considered in a proper perspective.

Bluhdorn apparently from the outset of his business career has been interested in the retail food market since for many years he was buying and selling commodities, including coffee. Indeed, he rhapsodized in his deposition about a "tough Irish [coffee] buyer" for the A & P whom he dealt with when he was first starting out in business.

As part of this interest, Bluhdorn had arranged for himself and three of his nominees to be on the Board of Directors of Bohack. Bohack is one of the major competitors of the A & P in the New York City metropolitan area.

Over the past two years, A & P, in an attempt to maintain its share of the market, started a food discounting program called WEO, which presently[1] stands for "Where Economy Originates". Basically, this program, which is now in effect in all A & P stores, calls for a reduction in the profit margins of the individual items sold with

---

1. The program was originally, tested in "Warehouse Economy Outlets", which gave rise to the WEO designation.

the expectation that the net profit would increase because of the greater volume of business generated by the lower prices.

Needless to say, this discounting program had an effect on A & P's competitors, including Bohack. After consultation with Bluhdorn, Mr. Binder, the President of Bohack, on September 14, 1972, held a press conference. During this press conference, Mr. Binder complained of the WEO program and exhorted "other businessmen who are being threatened by A & P to stand up and make themselves heard."

Some months before this press conference, on March 7, 1972, Bluhdorn started purchasing through Kidder Peabody, for the account of G & W, shares of A & P in the open market. This was done after a conversation on March 1, 1972, between Bluhdorn and Ralph DeNunzio, a leading figure in Kidder Peabody, in which Bluhdorn suggested to DeNunzio that he thought that the retail food area of the stock market was depressed and might be a good investment; that he was considering purchasing some A & P stock; and Mr. DeNunzio concurred that the purchase of A & P stock held "little downside risk". Mr. DeNunzio remembered the exact date of this conversation because it occurred in a limousine transporting the two men from Philadelphia to New York after Mr. DeNunzio had arranged for Bluhdorn to meet with some Philadelphia investor-clients of Kidder Peabody.

During the period between March 7, 1972 and January 18, 1973, G & W acquired 1,045,800 shares of A & P at a total cost of $18,405,268.70. These shares amount to 4.7% of the total outstanding shares of A & P. All of these shares were acquired for G & W by Kidder Peabody and were held in "street name".

About one-third of all of the outstanding shares of A & P are held by the John F. Hartford Foundation. In early November of 1972, Bluhdorn approached Mr. John S. Guest, of the firm of Kuhn Loeb & Co., stockbrokers, apparently in the belief that Mr. John Schiff, the senior partner of that firm, was a trustee of the Hartford Foundation. Bluhdorn told Mr. Guest that he was interested in purchasing all or part of the A & P shares held by the Hartford Foundation. Bluhdorn stated that he thought A & P was a good investment, particularly if A & P would accept the suggestions of G & W and the expertise of the "management team" of Bohack.

Later, Mr. Guest ascertained that Mr. Schiff was not a trustee of the Hartford Foundation but suggested that Bluhdorn put his proposal in writing.

At a second meeting with Guest, Bluhdorn said he did not want to put anything in writing but wanted to talk face to face with someone from the Hartford Foundation so that he could set forth his ideas.

Finally, Mr. Guest gave Bluhdorn the name of Mr. Mulraney, the attorney for the Hartford Foundation. Bluhdorn telephoned Mr. Mulraney, who in turn gave him the name of Mr. Swenson of First Boston Corporation, the financial advisor to the Hartford Foundation. Mr. Bluhdorn had a telephone conversation with Mr. Swenson and again was requested to put his proposal in writing. Apparently neither Bluhdorn nor G & W reduced any proposal to the Hartford Foundation to writing and nothing ever came of this venture.

During all of this time the A & P management was in the dark as to the activities of G & W and Bluhdorn.

On February 1, 1973, the Wall Street Journal carried a story that G & W was about to undertake a tender offer for A & P shares. William J. Kane, the Chairman of the Board and Chief Executive Officer of the A & P, has stated under oath, and this Court believes him, that his first inkling of the G & W "investment" in A & P came at about 9:00 a.m. on February 1, 1973, when this article was called to his attention.

On the same day, February 1, 1973, Bluhdorn had called a meeting of the

Board of Directors of G & W. At this meeting he presented his proposal for a tender offer for the A & P shares, which tender offer is the "eye of the hurricane" about which this case revolves.

In the forty-eight or seventy-two hour period prior to the G & W Board of Directors meeting on February 1, 1973, Bluhdorn caused the following to occur:

1) Bohack accepted his resignation and that of the other G & W insiders from the Board of Directors of Bohack;

2) notification was given to Mr. DeNunzio of Kidder Peabody that a tender offer might be made; and that he should settle upon an appropriate amount for the tender offer and the details of the contract under which Kidder Peabody would manage the tender offer;

3) the creation of a voting trust agreement of Bluhdorn's stock in Bohack with Mr. Binder and a Mr. Salgo as trustees thereunder (this voting trust agreement apparently has since undergone two revisions, both of which are dated as of February 1, 1973);

4) notification was given to Mr. Dolkart, General Counsel of G & W and a director thereof, that a tender offer was to be made for A & P shares;

5) G & W officers prepared a folder for each member of the Board of Directors of G & W containing two "service" type sheets (Standard & Poors and one other unidentified), two press clippings and a four page "Corporate Profile" prepared by G & W.

Apparently based upon Bluhdorn's presentation, the G & W Board of Directors voted for the proposal for the tender offer by G & W for the A & P shares, as set forth by Bluhdorn.

Counsel for G & W thereupon made a filing of Statement 13D required under Rule 14d of the General Rules and Regulations under the Securities Exchange Act of 1934, as amended.

Management of A & P immediately filed (on February 2, 1973) a similar statement with the Securities and Exchange Commission. This filing included, as Exhibit 1, a press release by William J. Kane. This statement reads as follows:

"WILLIAM J. KANE, CHAIRMAN OF THE BOARD OF THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., STATED TODAY THAT THE COMPANY WILL VIGOROUSLY OPPOSE THE GULF & WESTERN INDUSTRIES TENDER OFFER TO PURCHASE A BLOCK OF A & P SHARES.

"QUITE APART FROM THE FACT THAT THE OFFER OF $20 A SHARE IS INADEQUATE AND NOT IN THE BEST INTEREST OF OUR SHAREHOLDERS, IT WOULD SEEM THAT THE ACQUISITION OF A LARGE BLOCK OF A & P SHARES BY GULF & WESTERN RAISES MOST SERIOUS QUESTIONS UNDER THE ANTITRUST LAWS" Mr. Kane said.

"WE HAVE INSTRUCTED OUR ATTORNEYS TO TAKE WHATEVER ACTION IS PROPER TO PROTECT THE COMPANY AND ARE PREPARING TO COMMUNICATE WITH OUR SHAREHOLDERS PROMPTLY."

It is clear that this release was a stopgap measure. Mr. Kane testified that A & P was under great pressure from the media and from its own employees to make some statement in connection with G & W's tender offer. The following day, the management of A & P sent a more detailed statement to its shareholders. This statement is set out in full in footnote 2.[2]

G & W claims that this press release is false and misleading and thus in violation of the Securities Exchange Act of

2. Statement to shareholders appealed.

1934. Specifically, G & W claims that this press release is false and misleading on two counts: (1) no basis is given for the claim that the price of the tender offer is "inadequate"; and (2) there is no basis for the claim that the tender offer "raises most serious questions under the anti-trust laws."

I find that this argument is specious at best. The claimed violations of the anti-trust laws as set out in the verified answer and counterclaims filed by A & P certainly cannot be considered as sham. Thus it follows that the tender offer does raise "most serious questions under the anti-trust laws".

It is true that the press release does not set forth the basis on which the management of A & P found that the tender offer price was "inadequate". Contrary to the G & W claim, however, I do not find that this constitutes a false and misleading statement or an omission to state a material fact so as to make the statement false and misleading within the meaning of the Securities Exchange Act of 1934. The term "inadequate" when used in connection with the price of a stock is a highly subjective one. The price of a stock in the general market is controlled not only by the price-earnings ratios and other such mathematical formulae, but by the intuition or "hunch" of the buyers and sellers of the stock. Once this element of pricing is exposed it follows necessarily that the adequacy or inadequacy of price is subjective.

In any event, the basis for the opinion of the claimed "inadequacy" of the tender offer price was spelled out by the management of A & P in its letter to shareholders of February 3, 1973, and released to the press on that day. Accordingly, I find no equity to support G & W's assertion that it is entitled to equitable relief on the basis of the A & P press release of February 2, 1973.

But G & W also complains about the letter to shareholders sent by the management of A & P on February 3, 1973. The plaintiff asserts that the use of the "book value" of the stock of A & P in arguing that the tender offer price is inadequate is misleading. "Book value" is but one of the methods to be used in "pricing" a stock. Since, as I have said before, the adequacy or inadequacy of the price of a stock is due not only to mathematical formulae but also to the intuition of the buyers and sellers and, indeed, to the whims and caprice of the crowd, I find no equity to support this allegation of the plaintiff.

A & P's letter to shareholders is also claimed by G & W to be false and misleading in other respects, all of which basically go to a claimed failure by A & P management to state material facts.

In effect, G & W claims that the statement fails to disclose that (1) the tender offer price is approximately three dollars more than the price at which A & P shares were traded on the day before the tender offer; (2) that A & P shares had not traded at a price as high as the tender offer since the second quarter of 1972; (3) that A & P dividends had been in a continual decline since 1968, and that in early 1973, A & P declared it would not pay a dividend on its stock; and (4) that A & P had suffered a substantial loss in the first nine months of the fiscal year ending in February 1973.

In effect G & W complains that A & P did not reemphasize facts which might have been helpful to G & W in its tender offer although such facts would have been known to the ordinary investor in A & P either through the company's annual and quarterly statements or through papers of general circulation. For example, it is assumed that the ordinary investor would check the market price of his stock on the day before the tender offer before deciding whether to tender his shares. Similarly, it is assumed that the ordinary investor in A & P would have read the reports supplied to him by the company and would have known that A & P dividends were in a decline; that A & P had passed a dividend and that A & P had lost money.

■ I find that the alleged omissions were not material omissions and that the plaintiff has failed to show a reasonable expectation of success on the trial of the issues so as to cause this Court to issue the preliminary injunction sought by G & W. Nor does this Court find these issues so difficult and doubtful as to tip the balance of hardship toward G & W and thus warrant the issuance of injunction under the teachings of Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738 (2nd Cir. 1953), and Omega Importing Corp. v. Petri-Kine Camera Company, 451 F.2d 1190 (2nd Cir. 1971).

Turning now to the counterclaims by defendant, we see that they can be broadly divided into two groups: first that the tender offer, if consummated, would constitute a violation of the antitrust laws; and second, that the tender offer itself and the documents filed with the Securities and Exchange Commission regarding the offer constitute violations of the Securities Exchange Act of 1934.

■ The claimed violations of the anti-trust laws are far from clear. A & P alleges that it now controls 12.5 per cent of the retail food market in the New York metropolitan area. As we have already seen, at least up until the time of the tender offer, Bluhdorn controlled Bohack's which allegedly controls 5.5 per cent of the retail food market in the New York metropolitan area. A & P contends that the "voting trust" into which Bluhdorn transferred his Bohack shares is merely a "phony". In effect, Bluhdorn would be exercising effective control, according to the A & P argument, of 18 per cent of the retail food market for the New York metropolitan area. This certainly could tend to "lessen competition" in the New York City metropolitan area. Such a threat to competition, even though restricted to one geographical area, is sufficient under the anti-trust statutes. See: United States v. Pabst Brewing Company, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966) and United States v. Von's Grocery Company, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966).

In the Pabst Brewing Co. case, *supra*, 384 U.S. at page 549, 86 S.Ct. at page 1667, The Supreme Court in construing Section 7 of the Clayton Act, ruled:

"The language of this section requires merely that the Government prove the merger may have a substantial anticompetitive effect somewhere in the United States—'in *any* section' of the United States." [Emphasis in original].

A & P claims that the voting trust is a "sham" because Bluhdorn is turning over the Bohack shares to two persons whom he can control. To support its argument further, A & P points out that the voting trust agreement has been changed at least twice since it was first signed so as to lend more credence to it. Of course, A & P also relies on the "track record" of G & W and Bluhdorn to support its charge. This is sufficiently set forth in "Investigation of Conglomerate Corporations", a Report by the Staff of the Anti-Trust Subcommittee of the Committee on the Judiciary, House of Representatives, Ninety-Second Congress, June 1, 1971 (pages 158 to 212). That Report does not need repeating here. Suffice it to say that G & W and Bluhdorn have prospered by taking substantial minority interests in other corporations which permitted them to insinuate themselves onto the Board of Directors and then to take control of the Board and of the corporation.

It appears incredible, according to the A & P argument, in the light of this "track record", that G & W and Bluhdorn would put $90,000,000.00 in A & P stock merely as a passive investment. Bluhdorn testified that "as an investor of A & P, you can be assured that I will try, when and if I have a suggestion to make, to make it to management." He further indicated that he hoped "that we would be able to have some conversation." In fact, Bluhdorn stated that the relationship between G & W and A & P

would be that "in a very invisible way we could make a contribution." A & P argues from this that G & W and Bluhdorn in effect were not seeking an investment, but rather dominance over the affairs of A & P and in this sense, control.

The A & P also contends that the tender offer might be in violation of the anti-trust laws in a vertical way. G & W through some of its subsidiaries manufactures many items which would be sold in supermarkets. G & W, through other subsidiaries, also provides services, including financing, which could be used by supermarket suppliers. A & P argues that if G & W held a substantial interest in A & P, it would cause subtle pressures for it and its suppliers to reciprocate with the various subsidiaries of G & W.

G & W denies all of the anti-trust violations alleged by A & P. As for reciprocity, it points to its Executive Policy Manual and particularly that portion which prohibits reciprocal dealing among its subsidiaries. This Executive Policy Manual seems to me to be the type of thing that is a piece of pap published to be produced in any legislative or judicial inquiry. But A & P's claim that there would be illegal reciprocity is similarly totally unproven. The Court is left, therefore, with a claim and an intuitive feeling that at sometime in the future the claim might be proven.

As to the claim of horizontal violation of the anti-trust laws, G & W claims that as a 18 per cent holder of the shares of A & P, it would not be in a position of control. G & W points to the fact that the Hartford Foundation controls one-third of the shares of A & P and claims that the Foundation and the Hartford family when considered as a block, control over two-thirds of the outstanding shares of A & P.

There has not been a showing, however, that the Foundation and the family vote as a bloc or that such votes are controlled by the management. Indeed, the very fact that representatives of the Foundation requested Bluhdorn to put his proposal to acquire some of its A & P stock in writing militates against such a conclusion.

Mr. DeNunzio, whose deposition was taken as an officer of Kidder Peabody, the manager of the tender offer, testified that some of the Hartford family had indicated a willingness to tender their shares.

Indeed, Mr. Bluhdorn testified that an approach had been made on behalf of the family to one of his representatives.

Turning to the claimed violation of the Securities law alleged by the A & P, we find that these violations are intertwined to a great extent with the allegations that Bluhdorn and G & W will violate the anti-trust laws. It is alleged by A & P that the published tender offer and Schedule 13D filed with the Securities and Exchange Commission by G & W, omitted certain material facts in that they failed to disclose G & W's intention to acquire dominance of the A & P; that it failed to disclose that Bohack was the largest competitor of A & P in the New York City metropolitan area; and that Bluhdorn had effective control of Bohack; it failed to disclose the existence of a consent decree between Bohack and the Federal Trade Commission; and it failed to adequately describe G & W's business, including, in particular, the areas in which G & W controls companies producing products which are actual or potential suppliers of A & P.

A & P also alleges a violation of Section 14(d) (the Williams Act) of the Securities Exchange Act of 1934. The argument here is intriguing. A & P argues that Bluhdorn and G & W, having formed an intention to obtain control of A & P, in either March 1972 (when Bluhdorn had his conversation with Mr. DeNunzio regarding A & P and started his acquisition program) or at least in November 1972 (when Bluhdorn made his first approaches to the Hartford Foundation), should have filed a schedule 13D and designated their

market purchases as a tender offer. A & P questions whether the seller in the market place in January 1973 was not entitled to receive the same information with respect to G & W's plans and their effect on A & P, as a shareholder who tenders his stock under the tender offer. A & P urges that both are entitled to the same protection once G & W decided to acquire a substantial block of A & P stock since both are basically faced with the same investment decision. This argument is strained at best. It would require the integration of prior market purchases with the amount to be obtained through the tender offer. I find that this is not the law. It appears to this Court that the 5 per cent limit included in Section 14(d) permits that amount to be purchased in the open market without regard to any subsequent tender offer.

The issues in the other claims of the defendant, both under the anti-trust laws and the Securities law, unfortunately because of the time frame could not be fully litigated or decided in connection with the defendant's motion for a preliminary injunction. These questions are substantial, difficult and doubtful.

■■■ The law of this Circuit is, as enunciated in Hamilton Watch Co. v. Benrus Watch Co., *supra,* 206 F.2d at p. 740:

> "To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (*i.e.,* the balance of hardship tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."

The likelihood of success is merely one strong factor to be weighed along with the comparative injuries of the parties.

Unicon Management Corp. v. Koppers Company, Inc., 366 F.2d 199, 205 (2nd Cir. 1966).

■■ Thus the question left for this Court is to "balance the hardships" between the various parties.

Bluhdorn has testified that if the defendants were successful in obtaining a preliminary injunction, the market price of G & W stock would rise. He claimed that "Wall Street is condemning this as a lost cause", and that he had been advised that a successful tender offer was going to cost him personally as the biggest stockholder in G & W.

By issuing a preliminary injunction thus, it would appear that the only hardship on G & W and Bluhdorn would be the suspension of their tender offer, which clearly can be resuscitated in the future.

On the other hand, to permit the tender offer to go forward could have serious detrimental effects on A & P. It is possible that A & P would be involved in a violation of the anti-trust laws. There is testimony in the record that the executives of A & P have already suffered a tremendous downgrading of morale with just the suggestion that the company was about to be taken over by G & W. Moreover, if this Court permitted the tender offer to be consummated and at some later date were to find the violations charged by A & P, it would be almost impossible to unravel the situation. *Cf.* Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 947 (2nd Cir. 1969.)

■■ For the above reasons, a preliminary injunction will issue against G & W and Bluhdorn. The application by A & P for a preliminary injunction against Kidder Peabody is denied. There is no showing that Kidder Peabody was acting as anything but a stockbroker for G & W. Apparently it had no knowledge of any possible wrongdoing by G & W and Bluhdorn.

Settle order on notice.

APPENDIX

## THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.
FOUR HUNDRED TWENTY LEXINGTON AVENUE
NEW YORK, N. Y.  10017

OFFICE OF THE CHAIRMAN

February 3, 1973

Dear Shareholder:

A&P's management believes emphatically that it is *not* in your best interest to accept the inadequate price of $20 per share that Gulf & Western Industries, Inc. is offering for your A&P stock.

Gulf & Western obviously considers $20 per share to be a real bargain price.  Why else would that company be willing to take $78,000,000 from general corporate funds and sell various short-term investments in order to bet that A&P is a "turnaround" situation?

We think it's a good bet, too.  Here are some facts:

- Our WEO—Where Economy Originates—program is producing impressive results.  It is on target.
  - —Sales have been setting new records in every quarter of this fiscal year (which ends February 24, 1973):

    First quarter .............up  9% over last year
    Second quarter ...........up 15.6%
    Third quarter .............up 17.5%
    Fourth quarter to date ......up 20.4%

  - —Consumers clearly are demonstrating their enthusiasm and support for our A&P WEO concept.
  - —The momentum of the program has had its effect on income. With increased sales, operating losses declined as predicted from $20,500,000 and $21,100,000 in the first and second quarters to $8,371,000 in the third quarter.  This improving trend is continuing in the fourth quarter.
- The bulk of the extraordinary expenses to launch the WEO program is behind us.
  - —All of our stores have been converted to the WEO format.
  - —So far this fiscal year we have opened 74 new stores and modernized 173 others while eliminating 371 outmoded units.
  - —With the WEO conversion program completed, our fourth quarter will not be burdened by change-over costs.
- We are accelerating our 1973 store development program with a capital investment of $100,000,000—the largest in our 113-year history.
- A&P's programs to increase efficiency and reduce costs are making excellent progress.  We have nearly completed the computerization of our 32 divisions.  We are automating distribution centers. And we are developing the next generation of managers at all levels.

Gulf & Western is understandably eager to pay only $20 for a share of stock having a conservative book value of more than $24.  Obviously

Gulf & Western would like to purchase at a cheap price the value that rightfully belongs to you. The press on Friday reported that a Gulf & Western executive viewed A&P as an investment partly because management probably has the company on its way to a turnaround, with the upside potential great compared to the downside risk.

Our attorneys have advised us that the acquisition by Gulf & Western of a large block of A&P stock raises serious questions under the anti-trust laws and we have instructed them to take whatever action deemed appropriate to protect A&P's interests.

One further point: by the terms of its announcement Gulf & Western has committed itself to spend at least $3,000,000 in expenses, including special commissions to brokers, banks and trust companies to solicit you to accept this offer. We urge that you keep this in mind should you be importuned by anyone to act in haste regarding your investment.

We ask that you consider all of these points very carefully. Decide for yourself whether you shouldn't stay with this "turnaround" situation. There is no need to act hurriedly; to do so might prove to be most unwise.

A&P is emerging from a period that has been difficult for all of us. Together we have accomplished far more in less than one year than anyone believed possible. We are confident that when you think about how far along the recovery road we have traveled and how near we may be to our goals, you will take renewed pride in being an A&P shareowner—and remain an A&P shareowner.

Sincerely,

(s) William J. Kane

WILLIAM J. KANE
*Chairman of the Board*