**CORENCO CORPORATION, Plaintiff,**

v.

**SCHIAVONE & SONS, INC., et al., Defendants,**

and

**Chester K. Twiss et al., Additional Defendants to Counterclaim.**

No. 73 Civ. 3272.

United States District Court, S. D. New York.

Aug. 9, 1973.

Cahill, Gordon & Reindel, Demas & Hall, New York City, for plaintiff; Jerome Doyle, Leonard A. Spivak, George Wailand, Allen S. Joslyn, New York City, Eric Harris, David H. Hall, New York City, Richard L. Brickley, Boston, Mass., of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants Schiavone & Sons, Inc., Michael Schiavone & Sons, Inc., Joel Schiavone; Robert W. Sweet, Thomas J. Schwarz, Edward Yodowitz, William Alesi, Blaine V. Fogg, New York City, of counsel.

Lord, Day & Lord, New York City, for defendant Reed Rubin; William E. McCurdy, Jr., New York City, of counsel.

Borden & Ball, New York City, for defendant Singer & Mackie, Inc.; Joel S. Hanover, New York City, of counsel.

Webster, Sheffield, Fleischmann, Hitchcock & Brookfield, New York City, for defendant D. F. King & Co., Inc.; Donald J. Cohn, New York City, of counsel.

Winthrop, Stimson, Putnam & Roberts, New York City, for defendant Bear, Stearns & Co.; Stephen A. Weiner, New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge:

### Prior Proceedings

Plaintiff Corenco Corporation ("Corenco") instituted this action on July 25, 1973, in an attempt to block a cash tender offer for Corenco stock announced by defendant Schiavone & Sons, Inc. ("Schiavone") on July 17, 1973. Corenco seeks to enjoin Schiavone, its parent, Michael Schiavone and Sons, Incorporated ("Michael Schiavone"), and Joel Schiavone (together "the Schiavone defendants") and anyone acting on their behalf from soliciting the tender of any Corenco shares; acquiring any Corenco shares as a result of the tender offer; further soliciting proxies of Corenco common stock stockholders; voting any shares of Corenco common stock or proxies; and otherwise utilizing such stock as a means of gaining control of Corenco. Corenco alleges violations of §§ 13(d), 14(a), 14(d), and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78m(d) and 78n(a)(d), and (e) and Rules promulgated pursuant thereto. Corenco also alleges violations of § 7 of the Clayton Act, 15 U.S.C. § 18, and §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

By order to show cause dated July 26, 1973, Corenco moved for a preliminary injunction and for expedited discovery.

The Schiavone defendants in their amended answer and counterclaims seek judgment, *inter alia,* dismissing the complaint; enjoining Corenco and its officers and directors (named as additional defendants in the counterclaim and called "Corenco's management", herein) from making false and mislead-

ing statements to Corenco's shareholders in an attempt to defeat the tender offer; and directing them as a group to file a Schedule 13D with the Securities and Exchange Commission (the "SEC"). By order to show cause dated August 2nd, the Schiavone defendants moved for a preliminary injunction on their claims.[1]

On August 3rd, pursuant to agreement among the parties, the Court ordered an accelerated trial on the merits. The evidence introduced at the trial on August 3rd and 4th consisted of live testimony, as well as deposition testimony and documentary evidence. The parties have also extensively briefed the factual and legal issues involved.

### The Parties

Plaintiff Corenco is a publicly-held corporation organized and existing by virtue of the laws of Maine. Its principal place of business is Tewksbury, Massachusetts. Corenco has 378,567 shares of common stock issued and outstanding. Its stock is traded over-the-counter. Corenco's principal business is the rendering of fats resulting in the production of tallow. Seventy-five to 80 percent of this production is exported. Within the last few years the plaintiff has also entered the fertilizer business and more recently has begun the production of shortening and of industrial oils.

Defendant Schiavone, a subsidiary of Michael Schiavone, is a closely-held corporation organized and existing by virtue of the laws of Massachusetts and has its principal place of business in Boston, Massachusetts. Schiavone's shares are neither registered pursuant to § 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78l, nor publicly traded. Schiavone's business is processing and merchandising scrap metals. Schiavone exported between 55 and 60 percent of its production in 1972 and between 80 and 85 percent in 1973.

Michael Schiavone is a Connecticut corporation with its principal place of business in that state. It is the parent corporation of defendant Schiavone & Sons, Inc. The parent is also a closely-held corporation engaged in the scrap metal business.

Joel Schiavone is vice president and a shareholder of Michael Schiavone and president, chief operating officer, and a director of Schiavone, the subsidiary.

Reed Rubin is engaged in the brokerage business. He arranged the introduction of Corenco management to Schiavone management in the hope that some form of merger or acquisition could be consummated between the two corporations. This, in turn, would result in his earning a finder's fee. Plaintiff also alleges that Rubin with Schiavone formed a "group" within the meaning of § 13(d)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d)(1).

Singer & Mackie, Inc. is the brokerage firm employing defendant Rubin and for whom, plaintiff alleges, he carried out the attempt to bring Corenco and Schiavone together.

Bear, Stearns & Co. is dealer-manager for the tender offer. D. F. King and Co., Inc. has been stipulated out of the case.

The defendants on the counterclaim are all officers and/or directors of Corenco.

### The Facts Surrounding the Tender Offer and Counterclaim

On July 17, 1973, Schiavone announced a tender offer to purchase shares of Corenco common stock for cash at a price of $33 net per share. The bid price of Corenco stock was reported as $26½ per share and the asked price as $28 per share on July 16, 1973. Immediately prior to the announcement, Schiavone filed with the SEC, pursuant to Section 14(d) of the

---

1. The counterclaim was not served on Louis K. Adler. In addition, Corenco did not serve defendant Samuel Rubin.

Securities Exchange Act of 1934, a Statement on Schedule 13D and an Offer to Purchase dated July 17, 1973. An announcement of the tender offer appeared in *The Wall Street Journal* on July 18th and in other newspapers subsequently. The announcement stated, among other things, that the announcement itself did not constitute an offer and that the tender offer was being made only by Schiavone's July 17th Offer to Purchase and the related Letter of Tender.

Schiavone's July 17th Offer to Purchase stated that Schiavone would not be obligated to purchase fewer than 90,000 nor more than 130,000 Corenco shares— although Schiavone reserved the right to purchase fewer than 90,000 shares if less were tendered or more than 130,000 shares if more were tendered. Schiavone's Offer was to expire on August 2, 1973, unless extended by Schiavone. Shares tendered could be withdrawn prior to July 25th, or, unless previously purchased by Schiavone, after September 15th. Shares tendered prior to August 2nd and purchased by Schiavone were to be purchased on a pro rata basis.

Schiavone's July 17th Offer also disclosed that Michael Schiavone owned 18,300 Corenco shares, approximately 4.8% of the 378,567 outstanding shares of Corenco common stock, and that Michael Schiavone and Schiavone together would own approximately 28.6% of the outstanding Corenco shares if 90,000 shares were purchased pursuant to the Offer or approximately 39.2% of the outstanding Corenco shares if 130,000 shares were purchased. The July 17th Offer also contained disclosures concerning the terms and conditions of Schiavone's Offer; Schiavone's purpose in making the Offer, *i. e.*, to obtain control of Corenco with a view to a possible merger or other combination of the two companies; the market prices for Corenco's common stock during the period from January 1, 1971 through July 16, 1973, the day prior to the announcement of the Offer; financial and other information concern-

ing Corenco, including per share earnings and book value figures; the officers and directors of Schiavone and Michael Schiavone; the financing arrangements relating to the source of the funds required by Schiavone to purchase Corenco shares pursuant to the Offer; and other matters. The July 17th Offer did not contain any financial information about Schiavone and Michael Schiavone.

Shortly after the announcement of Schiavone's tender offer, the directors of Corenco unanimously voted to oppose the tender offer.

On July 19, 1973, Corenco's management sent a letter to all Corenco stockholders urging them to take no action with respect to Schiavone's Offer pending a "thorough study" and a further report by management.

On July 20th, Corenco's management sent to all Corenco stockholders a second letter stating, among other things, that the Schiavone Offer is "inadequate"; that management did not intend to tender to Schiavone "even a single share"; that the $33 price being offered by Schiavone is only "slightly above the current market price"; and that Schiavone is offering $33 per share because it believes Corenco is worth more.

On July 23rd, Corenco's Board of Directors declared a regular quarterly dividend of 30¢ per Corenco share and an extra cash dividend of 25¢ per share, payable August 13th to stockholders of record on August 3rd, and a 10% stock dividend, payable August 31st to stockholders of record on August 21st, and issued a press release disclosing the dividend declarations.

On July 24th, a story appeared in *The Wall Street Journal* under the headline "Corenco Urges Holders to Reject Tender Offer by Schiavone & Sons, Inc." In addition, on July 24th, Corenco issued a press release summarizing the results of Corenco's operations for the second quarter of 1973.

On July 25th, Corenco's management instituted this action. Corenco issued a

press release summarizing its claims of defendants' violations of the federal antitrust and securities laws, and on July 27th *The Wall Street Journal* published a story under the headline "Corenco Seeks Order Barring Schiavone Bid for Block of Its Stock" and the sub-caption "Suit Alleges Antitrust Violations—Schiavone to Extend Proposal Till After Hearing Set Aug. 6."

On July 26th, Corenco's management distributed a third letter to the Corenco shareholders repeating, in abbreviated form, the statements made in the July 20th letter; discussing Corenco's charges of antitrust and securities law violations by Schiavone; summarizing the results of Corenco's operations for the second quarter of 1973; stating that the second quarter results were not adversely affected by an embargo placed by the federal government on the export of certain Corenco products during the second quarter; and announcing the dividend declarations and stating that, under the terms of Schiavone's Offer, the dividends would have the effect of reducing the $33 price offered by Schiavone.

In addition, Corenco's officers and employees have telephoned "hundreds of [Corenco] shareholders" to urge them to reject Schiavone's Offer.

At the same time that Corenco's management was waging this publicity campaign against Schiavone's Offer, they were resisting efforts by Schiavone in the Superior Court of Maine to obtain a list of Corenco shareholders.

On July 30, 1973, Schiavone announced an extension of its Offer to August 9th and, immediately prior to the announcement, filed with the SEC an amendment to its Schedule 13D and an Extension and Amendment of Offer.

Schiavone's July 30th Extension and Amendment of Offer extended the period during which tendered shares might be withdrawn from August 1st through August 6th; and provided that shares tendered prior to August 9th and purchased by Schiavone would be purchased on a pro rata basis.

The July 30th amendment set forth Corenco's claims in this action, and also set forth some of the information which Corenco alleges should have been contained in Schiavone's July 17th Offer to Purchase. It did not contain financial information about the Schiavone defendants.

### Burden of Proof

■■ At a trial on the merits for a permanent injunction, the party seeking relief is required to prove by a preponderance of the evidence that a threatened violation of some legal right will result in irreparable injury to him. C. Tennant & Sons, Inc. v. New York Terminal Conference, 299 F.Supp. 796, 799 (S.D.N.Y.1969). It is not sufficient, as it is on a motion for a preliminary injunction, for the party requesting relief merely to show "probable success on the merits *and* possible irreparable injury," or to raise questions going to the merits so serious as "to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Sonesta International Hotels Corp. v. Wellington Associates, 483 F.2d 247 (2d Cir. 1973). (Emphasis in original.) As set forth below, the Court has concluded that Corenco has proved by a preponderance of the evidence that Schiavone's tender offer violates Section 14(e) and, if not enjoined, will result in irreparable injury to it and its shareholders.

### Violations of the Antitrust Laws

■ In order to prove a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, on the theory that an acquisition would prevent a potential entrant from competing in a market, it is necessary to establish that entry by the potential competitor is *probable*. Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc., 294 F.Supp. 1263 (D.Del.), rev'd and remanded on other grounds, 414 F. 2d 506 (3d Cir. 1969), cert. denied, 396

U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970); *cf.* United States v. Penn-Olin Co., 378 U.S. 158, 173–174, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964). This requires more than self-serving statements by management of the alleged potential entrant. There must be objective evidence which shows that the alleged entrant intends to enter or is objectively capable of entering the market. Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc., 414 F.2d 506, 532 n. 11 (dissenting opinion).

Thus, in *Allis Chalmers, supra,* the District Court found that Allis-Chalmers could not be considered a likely entrant into the electrical appliance market where the evidence consisted "entirely of statements by key members of Allis-Chalmers management"; there was no evidence that Allis-Chalmers had made "cost or competition studies" of the industry; and Allis-Chalmers had made no public mention of an intention to enter the industry prior to suing to block White's tender offer. 294 F.Supp. at 1267.

Although the Third Circuit reversed the District Court's dismissal of Allis-Chalmers' claim of potential entry into the metal rolling mill market, the Third Circuit based its decision on the likelihood of reciprocal dealing that a White takeover of Allis-Chalmers would create. Judge Aldisert, who would have affirmed the District Court's decision in all respects, in a separate dissenting opinion stated:

"[T]he instant case is atypical in that the alleged potential entrant is not the acquiring company, as in the usual case, but the acquired company. This presents a more difficult burden of proof problem: the motivation to prove a future intention to enter and thereby block the merger via the antitrust laws becomes obvious. Because of this, it is of even greater importance that the alleged potential entrant be judged in terms of its *objective capabilities* [emphasis by the Court] . . . . it is one thing for Allis-Chalmers to allege its intention to enter any of a given number of market areas presently occupied by White or one of its subsidiaries, in order to prevent the takeover, but it is quite another to present objective evidence of this intention, and to demonstrate the capability to do so." 414 F.2d at 532, n. 11.

The necessity of *objective evidence* is apparent in Kennecott Copper Corporation v. F.T.C., 467 F.2d 67 (10th Cir. 1972), petition for cert. filed, 41 U.S.L. W. 3332 (U.S. Oct. 25, 1972) (No. 637), where the acquisition of the nation's largest coal producer by Kennecott, the nation's largest copper producer, was held to be a violation of Section 7 of the Clayton Act. There, the Court relied on documentary evidence to establish a potential competition theory, including a long-range study of the coal business by Kennecott, numerous expressions by high-level Kennecott management of a desire to enter the coal business, and Kennecott's actual purchase and operation of a small coal producer in Utah.

■ Corenco has not demonstrated that *it* is a probable entrant into the scrap metal business. At most, it presented some evidence that it contemplated such a move and that entry is possible. Corenco's President, Chester K. Twiss, testified that no proposal to enter the scrap metal business has ever been submitted to Corenco's Board of Directors, nor has the Board approved such a course of action. Furthermore, Twiss, who is in charge of acquisitions for Corenco, has made no formal studies of the scrap metal industry whatsoever. The ignorance of the scrap metal business displayed by Twiss is most telling. He was unaware of the amount of return an investment in the scrap metal industry might bring, and he spoke only in vague generalities when talking about this industry.

Corenco is not currently engaged in negotiations with any scrap metal company. In fact, Corenco has only been in contact with one scrap metal company other than Schiavone, and that contact

was initiated by a third party. Corenco has only a general plan to diversify. At one time or another Twiss has considered the acquisition of companies in the rendering industry, the fertilizer industry and the food industry, and has even considered acquiring a seaweed company. Twiss has not made an analysis of the amount of capital Corenco could invest in any such acquisition, nor has he considered the return on investment in any specific industry. In short, Corenco has not shown the requisite *probability* —that Corenco will enter the scrap metal business.

Moreover, there are no economic factors present here to suggest that Corenco is a likely entrant into the scrap metal industry. Corenco's business is totally unrelated to that of Schiavone. Furthermore, Corenco's raw materials (animal by-products) and Schiavone's raw materials (scrap metals) are not purchased from the same sources; Corenco's products (edible and inedible fats and oils, and fertilizer) and Schiavone's products (processed scrap) are not sold to the same customers; and the manufacturing processes of Corenco and Schiavone are totally dissimilar. Twiss' theory that the companies are both in one industry dealing with the recycling of solid waste is imaginative but totally unpersuasive. No relationship exists between the companies to give weight to Corenco's potential competition theory.

Finally, there is no evidence that Corenco is recognized by scrap metal processors and exporters as a likely entrant into the scrap metal business. Thus, there is no showing that Corenco, a renderer of animal by-products and a producer of fertilizer, is hovering on the periphery of the scrap metal business exerting a restraining influence on leading scrap metal companies.

█ Even if it could be said that Corenco is a probable entrant into the scrap metal industry in the same part of the country where Schiavone is engaged in business, Shiavone's acquisition of control over Corenco could not substantially lessen competition because of the competitive structure of the scrap metal industry.

All cases where a violation of Section 7 of the Clayton Act has been based on the removal of a potential competitor have involved leading firms in concentrated industries and other economic factors not present here. As stated in Davidow, Conglomerate Concentration and Section Seven: The Limitations of the Anti-Merger Act, 68 Colum.L.Rev. 1231, 1244–45 (1968):

> "In the space of a few years, and a handful of cases, the standards for a merger case involving the issue of elimination of a potential entrant have become relatively clear. The acquired firm must be a 'significant factor' in a market so concentrated that potential competition provides one of the few checks on oligopolistic pricing. The acquiring firm—when judged in terms of its objective capability, its rational economic interest, and its evidenced interest—should be a likely direct competitor of the acquired firm at some time in the future. Finally, . . . the consolidation of a significant firm in a concentrated market and a potential competitor is not violative of Section 7 unless it appears that the outside firm was one of the most likely or most important potential entrants, or that there were very few other firms in a similar position."

The general nature of the scrap metal industry was described by Herschel Cutler, Ph.D. (Economics), Executive Director of the Institute of Scrap Iron and Steel. He said that it was "an industry exhibiting intense competitive characteristics." He also testified:

> "I think one of the major reasons why you have fragmentation, if you will, or the competitiveness, is the relative ease with which you can get into [the scrap metal] business or into a segment of the business and obviously this introduces a restraint to any concentrated effort."

Furthermore, there is undisputed testimony in the record by Dr. Cutler and James P. Donovan, President, New England Chapter of the Institute of Scrap Iron and Steel, and by Mr. Schiavone at the trial that it is relatively easy to get into scrap metal processing and exporting. While some of the equipment used by processors can cost several hundred thousand dollars if purchased new, there is "a constant flow of secondhand processing equipment available for sale." Similarly, Mr. Donovan recognized that if one was to enter the scrap processing business, he could do so with leased equipment or secondhand equipment and could use public facilities, which would enable him to enter the business at a substantial saving over the purchase of new equipment. Moreover, Dr. Cutler pointed out that in the scrap metal industry "there are no licenses to acquire, no franchises to acquire; none of those monopolitical, obligopolistical requirements such as franchises or areas or zones . . . ."

It has been recognized that where there is ease of entry into a market, there are many potential competitors who will enter the market, and the elimination of only one of them will not substantially lessen competition. *See,* Beatrice Foods Co. [1970–1973 Transfer Binder] CCH Trade Reg. Rep. ¶ 20,121 (1972). Corenco has not made a sufficient showing that it is one of only a few potential competitors in the scrap metal industry. To the contrary, there is clear evidence that the scrap metal industry exhibits ease of entry by many firms.

Finally, Corenco has failed to prove any relevant markets or Schiavone's share of any relevant market. For example, the evidence would support the conclusion that the scrap export market is a world market, and there is no reliable evidence as to the percentage of the export market held by Schiavone—Corenco attempts to compare 1971 Schiavone figures from a promotional brochure with 1972 preliminary figures of the Institute of Scrap Iron and Steel.

Furthermore, the relevant domestic market could include, in addition to the six New England States, at least New York, New Jersey, Pennsylvania and Ohio. But what Schiavone's share of the domestic market may be remains a matter of conjecture.

In short, Corenco has failed to prove its claim that Schiavone's proposed acquisition of control over Corenco would violate the antitrust laws. There is no evidence that entry by Corenco into the scrap metal business is *probable* or that Corenco is recognized as a probable entrant. Moreover, even if Corenco were viewed as a probable entrant, the competitive characteristics of the scrap metal industry and the ease of entry into the industry are such that the elimination of Corenco as a potential competitor would not substantially lessen competition. Finally, Corenco has failed to show relevant markets and market shares.

*Violations of Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d)*

It is essential to Corenco's claim under Section 13(d) of the 1934 Act that Corenco prove an agreement or conspiracy between the Schiavone defendants and defendant Reed Rubin to acquire Corenco stock. GAF Corporation v. Milstein, 453 F.2d 709 (2d Cir. 1971), cert. denied, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); Bath Industries, Inc. v. Blot, 427 F.2d 97 (7th Cir. 1970); Water & Wall Associates, Inc. v. American Consumer Industries, Inc., [Current] CCH Fed.Sec.L.Rep. ¶ 93,943 (D.N.J.1973).

As stated in the Senate and House Reports accompanying the Williams Act:

"This provision [Section 13(d)(3)] would prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provisions of the statute because no one individual owns more than 10 percent of the securities. The group would be deemed to have

become the beneficial owner, directly or indirectly, of more than 10 percent of a class of securities at the time they agreed to act in concert. Consequently, the group would be required to file the information called for in section 13(d)(1) within 10 days after they agree to act together, whether or not any member of the group had acquired any securities at that time." S.Rep. 550, 90th Cong., 1st Sess. 8 (1967); H.R.Rep. 1711, 90th Cong., 2d Sess. 8–9 (1968); 2 U.S.Code Cong. & Admin. News, 90th Cong., 2d Sess. (1968), 2811, 2818.

The following facts were developed in the depositions and at the trial:

Rubin first met Joel Schiavone in the fall of 1972 in connection with a transaction unrelated to this litigation. Subsequently, Rubin asked Mr. Schiavone if he would meet with representatives of Corenco. On October 18, 1972, Rubin met with Chester K. Twiss, President of Corenco, and inquired whether Twiss would be interested in looking at a scrap metal business. Twiss said that he would. Several meetings followed at which the possibility of Corenco's acquiring Schiavone was discussed.

During the course of these meetings, Twiss knew Rubin was interested in acting as a finder to bring acquisitions to Corenco and also admitted that he knew Rubin was seeking a fee for his work. On the other hand, there is no evidence of any agreement that Rubin would get a fee if Schiavone acquired control of Corenco by means of a tender offer. Nor is there evidence that Singer & Mackie, Rubin's employer, would receive a fee from a Schiavone acquisition of Corenco through a tender offer. Prior to the tender offer, Schiavone never advised Rubin of the tender offer and never knew of Rubin's interests in Corenco stock.

Corenco, in seeking to establish the "group", has called into question three of Reed Rubin's accounts which held Corenco stock during portions of the period discussed above: the Vera Rubin Trust, the Institute for the Study of Man, and the account of Samuel Rubin, Reed Rubin's father.

It is not disputed that during this period Singer & Mackie was a market maker in Corenco stock, or that Corenco was a financially sound company. Accordingly, it is not surprising that certain other of Rubin's customers had a position in Corenco stock both before and during the so-called "relevant" times prior to this litigation. It should be noted that the records of these accounts show that they contained approximately the same amounts of Corenco stock just prior to the tender offer as they did prior to the time that the Schiavone defendants met Reed Rubin. Moreover, these accounts show no unusual purchases after the alleged conspiracy began. On the contrary, sales of Corenco stock from these accounts were made prior to the announcement of the tender offer.

Inasmuch as Corenco has not met its burden of proving an agreement or conspiracy between the Schiavone defendants and defendant Reed Rubin to acquire Corenco stock, Corenco's claims of Section 13(d) violations must be dismissed.

### Violations of Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e)

Schiavone's original Schedule 13D and Letter of Tender and amended Schedule 13d and Letter of Tender fail to provide the shareholders of Corenco with any financial information whatsoever regarding Schiavone. This information, not otherwise available to the investing public, is under the circumstances of this case, of such importance to the Corenco shareholder desiring to make an informed decision on the tender offer that its nondisclosure constitutes a material omission. Faced with the following alternatives, the lack of such information makes the shareholder's choice a mere guess. He can tender his shares for $33 per share if the tender

offer is successful. He can hold his shares either because he believes that Corenco's stock is worth more than $33 or as a result of his desire to hold stock in a corporation to be controlled by Schiavone and which may be merged into Schiavone. He can sell on the market. He can purchase additional Corenco shares. Finally, he can tender some of his Corenco shares and retain the rest.

The importance of financial information to these investment decisions is demonstrated by the testimony of Joel Schiavone both at the trial on August 4, 1973, and in his deposition which was introduced at the trial. In his deposition Mr. Schiavone testified that he did not provide Mr. Saba, a stockbroker with Merrill Lynch, with financial or other information regarding the company "[s]imply [because] we want people to tender their stock . . .," and if he supplied financial information about his company the stockholders might not make tenders. One such example of financial information about the Schiavone defendants which would be material to a Corenco shareholder is the source of funds available to repay the bank loan taken by Schiavone to finance the tender offer. This information would only be available in the financial statements of the Schiavone defendants. Furthermore, Mr. Schiavone stated that as an investor he would want such financial information.

Defendants' response to Corenco's argument that, under the circumstances of this case, the total unavailability of any financial information regarding Schiavone to the holders of Corenco common stock constitutes a violation of Section 14(e) of the Securities Exchange Act of 1934, is that the section does not require that such financial information be provided. It is defendants' position that because financial information is not specifically enumerated in Section 14(d)(1) of the Securities Act of 1934 and Schedule 13D, it cannot constitute a violation of Section 14(e) to fail to provide such information. In the Court's view, this narrow construction of the statute would frustrate the end which the statute was designed to achieve, maximum shareholder protection.

In two recent decisions, Sonesta International Hotels Corp. v. Wellington Associates, 483 F.2d 247 (2d Cir. 1973) and Gulf & Western Industries, Inc. v. Great A. & P. Tea Co., Inc., 476 F.2d 687, 696 (2d Cir. 1973), violations of Section 14(e) were found where the information omitted from the Schedule 13D and tender offer was not specifically enumerated within Section 14(d)(1). In *Sonesta,* the information consisted of failure to disclose the size of a debt owed by the tender offeror to the target corporation and that the tender offer, if successful, might result in the loss of listing privileges on the New York Stock Exchange. In *Gulf & Western,* the Court found violations of Section 14(e) because the tender offeror failed to disclose whether it intended to replace A. & P.'s management and to disclose the underlying facts which may have presented substantial antitrust obstacles to the acquisition of control of A. & P. by Gulf & Western. Thus, any argument that an obligation to disclose material facts is limited to the specific requirements of Schedule 13D does not comport with recent case law.

Defendants also assert that this is a case of first impression. Most cases in this area are cases of first impression because the Williams Act is relatively new, having become law on July 29, 1968. Furthermore, tender offers by closely-held companies or individuals with respect to whom financial information is totally unavailable are extremely rare. That this issue has not previously been the subject of judicial determination is not, therefore, surprising and certainly not dispositive. As the Second Circuit observed in Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1171 (2d Cir. 1970):

"However, even where a defendant is successful in showing that it has followed a customary course in the industry, the first litigation of such a

practice is a proper occasion for its outlawry if it is in fact in violation."

Defendants also appear to be arguing that to require the disclosure here in question would turn every tender offer into an exchange offer (which requires a registration statement). This argument ignores Section 14(e) which requires that the materiality of the information must be judged separately in every case. Here, the following are relevant: (1) no financial information concerning Schiavone is available; (2) Schiavone seeks control; (3) Schiavone contemplates a merger; and (4) less than all shares are sought. To require the disclosure of sufficient information here to enable a Corenco shareholder to make an informed judgment does not mean that a Section 12 company making a tender offer, about whom abundant information is available, must supplement the information relating to its financial position and management record. Moreover, Schiavone need not provide such information to the extent required under the 1933 Act; but only that Corenco shareholders be provided with enough information to reach an informed decision.

In light of Schiavone's stated reason for not disclosing financial information, i. e., that Corenco stockholders may not have tendered had this information been available to them, one of the primary purposes of the Williams Act—the requirement of full disclosure—will be served by enjoining Schiavone's tender offer because of Schiavone's failure to disclose material financial information. To rule otherwise would be inconsistent with the mandate of the Supreme Court that the Exchange Act be liberally and not technically or restrictively construed. Affiliated Ute Citizens v. United States, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L. Ed.2d 741 (1972).

Congress, in passing the Williams Act indicated that:

"It has been argued that a cash tender offer is a straightforward business proposition which can be rejected or accepted by a shareholder like any other bid for his securities. But where no information is available about the persons seeking control, or their plans, the shareholder is forced to make a decision on the basis of a market price which reflects an evaluation of the company based on the assumption that the present management and its policies will continue.

"The persons seeking control, however, have information about themselves and about their plans which, if known to investors, might substantially change the assumptions on which the market price is based. This bill is designed to make the relevant facts known so that shareholders have a fair opportunity to make their decision."

\*    \*    \*    \*    \*    \*

"The bill avoids tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid. It is designed to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case.

"While the bill may discourage tender offers or other attempts to acquire control by some who are unwilling to expose themselves to the light of disclosure, the committee believes this is a small price to pay for adequate investor protection. In fact, experience under the Securities Act of 1933 and the Securities Exchange Act of 1934 has amply demonstrated that the disclosure requirements of the Federal securities acts are an aid to legitimate business transactions, not a hindrance." 2 U.S. Code Cong. & Admin. News, 90th Cong., 2d Sess. (1968) at, pp. 2813–14.

In view of the holdings of the Supreme Court and of the clear Congressional intent, the Court concludes that Schiavone's tender offer violates § 14(e).

### Defendants' Counterclaims

Defendants have asserted by way of counterclaims alleged violations

of the federal securities laws by Corenco's letters to stockholders including the following:

*Inadequacy of price.* In Gulf & Western Indus., Inc. v. Great A. & P. Tea Co., Inc., 356 F.Supp. 1066 (S.D.N.Y.), aff'd, 476 F.2d 687 (2d Cir.1973), Judge Duffy refused to find that the statement by management that the tender offer price was inadequate constituted a false and misleading statement or an omission. Judge Duffy said, "The term 'inadequate' when used in connection with the price of a stock is a highly subjective one." 356 F.Supp. at 1071. As evidence of subjectivity of the adequacy of price, Bear Stearns, a defendant in this action and dealer-manager for the tender offer, recommended a price of $34–$35 per share for the tender offer; defendant's Schedule 13D discloses that the offering price is below book value and the amended Schedule 13D further reveals that book value, because of the carrying of real estate at cost, is understated by several dollars per share.

Schiavone further alleges that Corenco violated Section 14(e) by failing to disclose such facts, *inter alia*, as the price of Corenco stock immediately prior to the offer and that dividends have been declining. Judge Duffy in *Gulf & Western, supra*, considered allegations like these not material, stating:

> "In effect G & W complains that A & P did not reemphasize facts which might have been helpful to G & W in its tender offer although such facts would have been known to the ordinary investor in A & P either through the company's annual and quarterly statements or through papers of general circulation. For example, it is assumed that the ordinary investor would check the market price of his stock on the day before the tender offer before deciding whether to tender his shares. Similarly, it is assumed that the ordinary investor in A & P would have read the reports supplied to him by the company and would have known that A & P dividends were in a decline; that A & P had passed a dividend and that A & P had lost money." 356 F.Supp. at 1071.

*Information regarding the embargo on the export on certain of Corenco products.* Defendants allege that plaintiff and counterclaim defendants should have disclosed that the new export embargo had no effect upon plaintiff's six months 1973 earnings figure because the embargo was not effective during the second quarter. The statement with respect to the embargo was inserted in plaintiff's letter to its shareholders to disclose the existence of the newly announced embargo and to indicate that earnings for the second half of 1973 might not be as high as earnings for the first half of 1973. At the time the letter was written the only licenses which had been applied for by plaintiff had been granted. Plaintiff's earnings for the first six months of 1973 were in fact not affected by the embargo and the letter so states.

■ *The claim that plaintiff's Board of Directors and Management should have filed a Schedule 13D.* Plaintiff has filed a Schedule 14D, the only statement it is required to file under the 1934 Act. The statement filed by plaintiff contains all of the information required under the applicable statutory provisions.

The purpose of Section 13(d) is to disclose changes in corporate control. This purpose would not be furthered in the present case by requiring the filing of a Schedule by a management which resists a tender offer when the Schedule would only duplicate information already disclosed.

The remainder of the statements pointed out by defendants as violative of the securities laws do not, in the Court's view, constitute false or misleading statements or omissions in violation of law.

### Conclusion

Accordingly, plaintiff is granted a permanent injunction enjoining the Schiavone defendants, Bear Stearns &

Co., and anyone acting on their behalf from soliciting the tender of any Corenco shares; acquiring any Corenco shares as a result of the tender offer; further soliciting proxies of Corenco common stock stockholders; voting any shares of Corenco common stock or proxies; and otherwise utilizing such stock as a means of gaining control of Corenco unless and until the Schiavone defendants make full disclosure of financial information about Schiavone and Michael Schiavone. In all other respects, plaintiff's complaint is dismissed. Defendants' counterclaims are dismissed.

The foregoing constitutes the findings of fact and conclusions of law of the Court for the purposes of Rule 52, Fed. R.Civ.P.

Settle judgment on one day's notice.