**ARMOUR AND COMPANY and McClure Kelley, Plaintiffs,**

v.

**GENERAL HOST CORPORATION et al., Defendants.**

**No. 69 Civil 279.**

United States District Court
S. D. New York.

Feb. 7, 1969.

Sullivan & Cromwell, New York City, for plaintiffs, Arthur Dean, Robert Mac-Crate, Robert M. Osgood, John F. Cannon, Joseph McLaughlin, New York City, of counsel.

Lovejoy, Wasson, Lundgren & Ashton, New York City, for defendant, General Host Corp., Edwin E. McAmis, Douglas Foster, James J. Murray, New York City, of counsel.

Holtzmann, Wise & Shepard, New York City, for defendants, Allen & Co. and Allen & Co., Inc., George M. Duff, Jr., New York City, of counsel.

Goldfeld, Charak, Tolins & Lowenfels, New York City, for defendant, Kleiner, Bell & Co., Inc., Lewis D. Lowenfels, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This action involves another "target" in the securities market, Armour and Company (Armour), whose control is sought by two contenders. The action is brought by Armour and one of its stockholders on behalf of themselves and other common stockholders (other than defendants) to enjoin the exchange of securities offered by the defendant General Host Corporation (General Host), one of the two contenders for the favor of Armour stockholders; also named as defendants with General Host are its principal officers and dealer-managers, who are charged with various violations of the Securities laws.[1]

The thrust of the charges levelled against the defendants is a conspiracy to gain control of Armour, said to be ten times larger than General Host, through means of manipulative, misleading and deceptive practices to be effected by an exchange of Armour common stock for General Host securities, which plaintiffs contend are highly speculative.

On December 30, 1968, General Host filed with the Securities and Exchange Commission its registration statement (Form S-1) for the General Host debentures and warrants it proposed to offer to the shareholders of the Armour common stock. After the filing of amendments, the registration became effective on January 30, 1969. Under the prospectus General Host offered for each tendered share of Armour common stock, $60 principal amount of 7% subordinated debentures of General Host due 1994 and 2½ warrants expiring in 1979 to purchase one share of General Host common stock at $40 per share. Under a change announced January 31, the debentures at principal amount may be used to pay the purchase price upon the exercise of the warrants for the General Host stock re-

---

1. § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), §§ 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(e), as well as Rules 10b-5 and 10b-6 promulgated thereunder, and § 7(a) of the Investment Company Act of 1940, 15 U.S.C. § 80a-7(a).

gardless of the debentures' market value at the time. General Host will not accept any tendered Armour securities unless, upon acceptance of such securities, together with its presently owned 16.5% shares, it would own more than 50% of all the outstanding shares of Armour common stock. The offer of General Host expires on February 14.

Realistically, although not a party to this litigation, but very much involved in it, is a wholly owned subsidiary of Greyhound Corporation (Greyhound), the other suitor for the favor of Armour stockholders. On January 28, 1969, Greyhound offered to purchase for cash 2½ million shares of Armour, originally at $65 a share, increased to $70 a share following the General Host offer. The Greyhound cash offer expires on February 10, 1969. Armour's Chairman of the Board and his family have sold 500,000 shares of Armour to Greyhound, and he has notified all Armour shareholders to this effect and espoused the Greyhound proposal. That he and the Armour management, as well as its investment advisor, are opposed to the General Host offer and have resisted the efforts of that group to acquire control of Armour is stating a fact. The burden of their complaint, no matter how variously stated, is that the intrinsic investment value of the General Host securities being offered is substantially less than the value of the securities which the Armour stockholders are asked to exchange for their stock and that the prospectus fails to disclose information to that effect.

At immediate issue is an application for a temporary restraining order and for a preliminary injunction which would prohibit the defendants from taking any action to effect the exchange. A prior application for a temporary restraining order was denied by Judge Bryan on January 27, 1969, following which plaintiffs were given leave to take depositions with respect to the motion for a preliminary injunction. The deposition testimony resulted in a second application by plaintiffs for a temporary restraining order based on alleged violations of Rule 10b–6, which was heard by this Court together with the motion for the preliminary injunction. As is not unusual in matters of this kind, the motions were heard and the testimony of witnesses taken before the Court under trip hammer pressure—with voluminous affidavits and hundreds of pages of depositions for the Court to consider in reaching a determination.

(1) The motion for a preliminary injunction:

The origin of the controversy goes back to August, 1968, when General Host purchased 150,000 shares of Armour common stock. Subsequently it made substantial purchases of the stock, the funds for which were obtained principally by the private placement of $47,900,-000 of General Host 5% convertible subordinate notes, which were duly authorized at a special meeting of stockholders and in connection with which a proxy statement was previously issued. General Host filed with the Securities and Exchange Commission a Schedule 13D [2] as to its interest in Armour, and as it acquired additional stock, filed amendments to the schedule through to December 2, 1968. On November 25, 1968, Armour's counsel urged the SEC to investigate to determine whether General Host should be registered as an investment company. In early December, 1968, as a result of private and open market purchases, General Host owned 1,002,500 shares of the outstanding Armour common stock, approximately 16.5%, and became its largest stockholder. Also early in December, Armour's counsel conferred with SEC officials relative to General Host stock acquisitions, followed by a letter to the Commission's General Counsel in which the Armour counsel stated their belief that the 5% convertible note issue by General Host and the purchase of the Armour stock with the proceeds of the notes were the first step in a program to take over control of Armour.

2. § 13(d), 15 U.S.C. § 78m(d).

Counsel for Armour also charged General Host, admittedly upon hearsay, with violations of the Securities Exchange Act of 1934 and urged an investigation and action by the Commission.

On December 24, 1968, General Host issued a public release of its intended offer to acquire Armour stock, which was publicized in various newspapers. On December 27 General Host cleared with the SEC and mailed to its stockholders a proxy statement relative to a special meeting for the purpose of increasing the authorized capital stock of General Host and for approval of the exchange offer of 7% subordinated debentures and warrants for the exchange of the Armour common stock to be made to the Armour stockholders. And on December 30, 1968, as already noted, General Host filed with the SEC the registration statement covering the exchange offer. The prospectus included verbatim the material in the proxy statement to General Host stockholders.

Soon after the filing of the registration statement, Armour's counsel, on January 3, 1969, again conferred with SEC officials, following which they sent the Commission a detailed memorandum "in order that the Staff may consider carefully why we consider the proxy statement and the registration statement to be misleading both to the stockholders of General Host and to the offeree Armour stockholders." The memorandum contains specifications of alleged deficiencies, material misrepresentations and omissions which parallel the charges now made, as well as others.[3]

In addition, it voices the opinion of counsel that General Host is now an investment company and that the proposed issuance of the 7% subordinated debentures and warrants would be illegal—a charge also made here.

Armour counsel continued to press vigorously before the SEC what they termed the "gross inadequacies in the registration statement" and brought their contentions to the notice of the Commission's Chairman, "so that the staff review of the registration statement will not be carried out under any summary or accelerated procedure, and so that members of the Commission itself are aware of the material deficiencies in the registration statement."[4] The Chairman responded that the staff would undertake "to process the registration statement in a manner consistent with our responsibilities under the Act."[5]

The deficiencies urged upon the Commission by Armour in opposition to the registration included: alleged misstatements or omissions as to the inadequacies of the offer; the subordinated and long term nature of the debentures; the lack of protective covenants restricting debt loans to others; investments in others and minimum working capital. Armour pressed that the debentures and warrants are unsound. It charged the unlikelihood that General Host would be able to pay principal and interest as due, based on (1) the projected cash flow of General Host after the exchange offer; (2) the net tangible assets of General Host after the exchange offer; (3) the terms of the debentures; and (4) the implications of

---

3. Included was a charge that control of Armour by General Host, as now constituted, would be a flagrant violation of the principles of the Packers' consent decree of 1920. On January 20, 1969, the Department of Justice commenced a suit in the United States District Court for the Northern District of Illinois to add General Host as a party to the decree, and applied for an injunction to restrain General Host from commencing its exchange offer and from acquiring additional shares of Armour stock. After a hearing on January 21, 1969, the mo-

tion for a temporary restraining order against General Host was denied and the petition dismissed in all respects. The prospectus contains a reference to this situation, as well as to other matters in the event the Department of Justice appeal is successful or if the Department were to succeed in some other action under the heading "antitrust aspects."

4. Letter of January 6, 1969, addressed to Hon. Manuel F. Cohen, Chairman.

5. Letter of January 17, 1969.

the 1920 Packers' consent decree.[6] Every conceivable shortcoming of the offer or alleged fraudulent conduct, or claimed violations of the Securities acts, some claims going beyond those here presented, were advanced to the Commission in opposition to the registration. The charges were also submitted to State Blue Sky official bodies by memoranda similar to those presented to the Commission.[7]

General Host, during the processing of the registration, either upon request of the Commission or upon its own initiative, submitted data, supplements, amendments and other matters as to questioned items and in support of the registration of the securities.

On January 23, following authorization by General Host stockholders for the exchange program, plaintiffs commenced this action and promptly sent a copy of the complaint to the SEC. Their resistance to the registration continued to the very day it became effective, January 30. Armour's opposition was not limited to representations before official bodies. Through the month of January, 1969, while the registration was being processed, Armour publicly attacked the General Host proposal, and its views were widely disseminated. The news media, based on press releases issued by the Armour group, published the specific claims that it was very unlikely General Host would be able to pay principal and interest on the subordinated debentures; that the value of the warrants was illusory, and that the tax consequences to Armour stockolders would be adverse. A full-page advertisement addressed to Armour stockholders by the Chairman of the Armour board, published in the Wall Street Journal, the New York Times and other news media throughout the country, denigrated the General Host securi-

ties and went into considerable detail as to the undesirability of the exchange. His statement raised questions whether General Host would have the cash flow necessary to service its greatly increased debt and touched upon other claimed deficiences.

This suit is based essentially upon the same charges that Armour has directed against the General Host proposal before official bodies charged by law with policing the alleged illegal activity. The opinion of Armour, its management and investment advisor, based upon their microscopic analysis of the prospectus and their projection of future events, that the intrinsic investment value of the offered General Host securities is substantially less than the value of the securities which the Armour stockholders are being asked to tender in exchange, however sincerely held their views may be, still remains a matter of opinion. The question is not: Is this a good or an improvident deal for the Armour stockholders, or could a better or more favorable offer be obtained, one that has better protective terms and conditions for Armour stockholders? At this stage the issue is: Have the plaintiffs sufficiently proved the alleged violations by the defendants of the securities laws[8]—and if so, has there been a sufficient showing of irreparable injury, or, as it has been otherwise stated, "harm which cannot be repaired,"[9] to warrant the court to exercise its equity power to stay the exchange offer and any acts in furtherance of its consummation?[10]

The testimony of plaintiffs' witnesses at the hearing highlighted the prior contentions of Armour as to the alleged highly speculative and undesirable investment of the General Host securities as against the Armour stock. There is a dispute between accountants as to the

---

6. Memorandum attached to letter to SEC, dated January 23, 1969.

7. The Illinois Secretary of State, based on the allegations of Armour, issued a stay ex parte. A motion to vacate the stay is yet to be heard.

8. Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937 (2d Cir. Jan. 24, 1969).

9. Studebaker Corp. v. Gittlin, 360 F.2d 692, 698 (2d Cir. 1966).

10. Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

basis upon which the General Host cash flow, if the exchange is realized, should be projected, with the usual consequence of such expert divergence. Plaintiff called an investment banker, who condemned the General Host securities, but his judgment is to be evaluated in light of the fact that his firm has been the investment banker for Armour for years, as well as its managing underwriter; also, one of his partners is its investment advisor, a director of Armour, and a member of its Executive Committee.

As against the evidence and the contentions of Armour, there is not only defendants' denial of any misrepresentation, misstatements, omission or conspiratorial conduct. There is also the fact that the SEC permitted the registration statement to become effective. Indeed, it would be remarkable that, after Armour had pinpointed its various claims of violations of the securities laws, the Commission, if there were substance to any claim that remained uncorrected, allowed the registration statement to become effective and the securities to be offered to the public. To be sure, the registration of the securities carries with it neither the approval nor disapproval of the Commission.[11] Yet, when the very charges plaintiff advanced before the Commission are renewed on this motion and denied by the defendants, the SEC's clearance of the registration statement may be accorded some weight.[12] Upon the entire record there has not been a sufficient showing at this time that the defendants have violated, as alleged, the securities laws.

Moreover, the equities of the situation speak against an injunction. Indeed, they require that the stockholders not be deprived of an opportunity to accept either the cash offer of Greyhound or the exchange offer of General Host, or to reject both. The stockholders are entitled to exercise their own judgment as to these matters. The plaintiffs' contention that the exchange offer is highly speculative and otherwise undesirable for Armour stockholders has, as noted, been extensively publicized. The Armour stockholders are aware of plaintiffs' claims of the alleged speculative nature of the securities being offered and the alleged shortcomings of the General Host proposal. The decision whether to buy, exchange, or do neither should rest with each individual stockholder.[13] Further, assuming arguendo that there are violations of the securities laws, which is far from clear on this record, Armour stockholders who accept the General Host offer may be compensated by money damages through this very suit.

An added consideration is the competing cash tender offer of Greyhound. Armour management here seeks to limit its shareholders to the Greyhound offer, which its chief executive officer has accepted for his 500,000 shares. To grant the stay of the General Host exchange offer, while at the same time the Greyhound cash offer remains available, has an element of unfairness to those Armour stockholders who may wish to sell. Perforce it leaves them little alternative—to grant the stay means they must either sell to Greyhound or else run the risk that no other tender offer they deem desirable, whether cash or securities, may be made for their stock for some time, if at all. As to those Armour stockholders who already have tendered their shares to General Host, they should not be foreclosed of their right to accept that proposal which evidently they deemed more desirable than the competing Greyhound offer. Plaintiffs have attempted to show neither that such stockholders were not aware of

11. 17 C.F.R. § 230.425.

12. *Cf.* General Time Corp. v. Talley Industries, Inc., 403 F.2d 159, 163 (2d Cir. 1968); Sherman v. Posner, 266 F. Supp. 871, 874 (S.D.N.Y.1966); Kauder v. United Board & Carton Corp., 199 F. Supp. 420, 423–424 (S.D.N.Y.1961);

Mack v. Mishkin, 172 F.Supp. 885, 888 (S.D.N.Y.1959); Dunn v. Decca Records, Inc., 120 F.Supp. 1, 2 (S.D.N.Y. 1954).

13. American Crystal Sugar Co. v. Cuban-American Sugar Co., 276 F.Supp. 45, 50 (S.D.N.Y.1967).

the alleged omissions and deceptive conduct and the charges levelled against the General Host proposal, nor, if they were unaware, that they would not have offered their shares to General Host had they known of such charges.[14]

There has been no showing of irreparable injury either to the plaintiff corporation or to its stockholders that outweighs the irreparable injury which would be visited upon General Host. Apart from the heavy expense already incurred by General Host, the granting of a preliminary injunction would give Armour, without a trial, the full relief it would be entitled to only if it succeeded after a trial upon the merits. From a practical point of view, even were General Host to prevail upon the trial, the grant of the injunction would defeat its exchange offer.[15]

Weighing all pertinent factors, and in the exercise of discretion, the motion for a preliminary injunction is denied.[16]

(2) The motion for a temporary restraining order:

█ This motion must also be denied. Plaintiffs contend that defendant Klein-

er, Bell violated Rule 10b–6 when it acted as broker in two large-bloc transfers of Armour stock after the registration became effective.[17] At this stage of the litigation plaintiffs' claim for this relief is at best supported, as plaintiffs' counsel candidly conceded, by "circumstantial evidence." That the blocs traded hands at a price above both market and the competing cash tender offer of Greyhound may tend to support plaintiffs' position. But the inference that is urged be drawn from the mere fact of the transactions does not overcome the sworn testimony of an executive officer of Kleiner, Bell based upon company records that the buy order was unsolicited by the firm, which, if so, exempts the transactions from the requirements of Rule 10b–6.

Plaintiffs have not overcome, by clear and convincing facts, the existing evidence that brings the transactions within the exemption. Moreover, substantial legal issues exist whether Rule 10b–6 is applicable at all to the instant transactions.[18]

14. Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 948 (2d Cir. Jan. 24, 1969) ; Symington Wayne Corp. v. Dresser Industries, Inc., 383 F.2d 840, 843 (2d Cir. 1967).

15. Kauder v. United Board & Carton Corp., 199 F.Supp. 420, 424 (S.D.N.Y. 1961) ; Mack v. Mishkin, 172 F.Supp. 885, 889 (S.D.N.Y.1959).

16. Nor can the application for preliminary relief find support in the charged violation of the Investment Company Act. Armour lacks standing to raise such an issue, SEC v. General Time Corp., 407 F. 2d 65 (2d Cir. Nov. 19, 1968), and the same reasoning would seem to apply to plaintiff Kelley insofar as he sues on his own behalf. Apart from the question whether plaintiffs fairly represent the class of all Armour stockholders (other than defendants), which necessarily in-

cludes those who may look favorably upon the General Host offer, there remain the issues whether General Host has in fact brought itself within the Act and whether such plaintiffs who may eventually be determined to have standing do not then have their adequate remedy at law, whether by rescission or damages. Moreover, with the charge that there was a violation of § 7(a) directly presented more than once to the SEC, it is not likely as to this aspect of plaintiffs' charges that the SEC would have looked the other way.

17. Plaintiffs also allege that a director of the parent of the buyer in both transactions is an officer of one of the defendants here.

18. The principal question is whether subsection (b) of the Rule applies to the stock of the "target" corporation, as well as that of the distributor.