Alan L. SPIELMAN, Plaintiff,

v.

GENERAL HOST CORPORATION
et al., Defendants.

No. 73 Civ. 573.

United States District Court,
S. D. New York.

Aug. 14, 1975.

Milberg & Weiss, New York City, for plaintiff; Melvyn I. Weiss, Bernard A. Feuerstein, New York City, of counsel.

Lovejoy, Wasson, Lundgren & Ashton, New York City, for defendants General Host Corp., Harris J. Ashton, Weston E. Hamilton, C. Whitcomb Alden, Joseph P. Binns and Leslie W. Scott; Edwin E. McAmis, Daniel J. Sullivan, New York City, of counsel.

Havens, Wandless, Stitt & Tighe, New York City, for defendant Richard C. Pistell; Gary P. Rosenthal, Gerald J. Fields, New York City, of counsel.

Holtzmann, Wise & Shepard, Shea, Gould, Climenko, Kramer & Casey, New York City, for defendant Allen & Company, Inc.; George M. Duff, Jr., Norman Solovay, Robert H. Werbel, Milton S. Gould, Harvey J. Goldschmid, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

■ This is yet another lawsuit arising from the 1969 contest between General Host Corporation ("General Host") and a wholly-owned subsidiary of the Greyhound Corporation ("Greyhound") for control of Armour & Co. ("Armour").[1] Plaintiff Alan L. Spielman brings this class action on behalf of holders of Armour common stock or convertible debentures[2] against General Host, certain of its directors at the time of the exchange offer, and Allen & Co., Inc., one of the dealer-managers of the exchange offer.[3] Plaintiff contends that Armour security holders were materially misinformed during the battle for control of Armour because the General Host prospectus of January 30, 1969 was misleading in failing to set forth relevant facts concerning (1) General

1. See *Voege v. Ackerman*, 67 F.R.D. 432 (S.D.N.Y.1975); *Armour & Co. v. General Host Corp.*, 296 F.Supp. 470 (S.D.N.Y.1969).

2. The class is composed of three subclasses:
"(a) Those persons or entities who held Armour securities, either common stock or convertible debentures, prior to July 29, 1968, and exchanged them for General Host debentures and warrants pursuant to an Exchange Offer alleged hereinbelow and did not accept the Greyhound Cash Tender Offer alleged below;
"(b) Those persons or entities who purchased Armour securities, either common stock or convertible debentures, between July 29, 1968 and February 14, 1969, did not accept the Greyhound Cash Tender Offer, and exchanged them for General Host debentures and warrants issued pursuant to the said Exchange Offer;
"(c) Those persons or entities who purchased Armour securities between July 29, 1968 and February 14, 1969 and held them without tendering them to either General Host or Greyhound."
Defendants are entitled to judgment as to the third subclass. The theory of plaintiff's case is that the General Host prospectus was materially misleading in failing to disclose the alleged risks that General Host was incurring in making its offer, and hence that it overstated the merits of the offer. There is no claim that General Host fraudulently understated the desirability of its offer. See *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed. 2d 539 (1975). Thus plaintiff has failed to show that those who did *not* exchange their Armour securities for General Host debentures were in any way injured by the alleged misstatements and omissions.

3. At the conclusion of the trial, the case was dismissed as to Allen & Co., a partnership in the securities business that caused the formation of Allen & Co., Inc. in 1965.

Host's ability to meet its cash needs from internally generated funds and (2) its ability to secure effective operating control of Armour upon successful completion of its exchange offer. Thus, plaintiff contends defendants violated section 14(e) of the Williams Act [4] and the antifraud provisions of the Securities Act of 1933 [5] and the Securities Exchange Act of 1934. [6]

On December 12, 1968, having already acquired 16½% of the then outstanding Armour common stock, General Host filed a Schedule 13D with the Securities and Exchange Commission reporting that it was considering the possibility of obtaining control of Armour based upon an exchange offer for additional Armour securities. On December 23, 1968, after consultation with its dealer-managers, Allen & Co., Inc. and Kleiner, Bell & Co., General Host announced that it would offer to exchange for Armour securities its 7% subordinated debentures in the principal amount of $347,040,000 due February 1, 1994, and warrants to purchase General Host common stock. On December 30 it filed a registration statement and prospectus with the Securities and Exchange Commission. The proposed exchange offer specified that General Host would not accept any Armour securities unless a sufficient number of Armour shares or convertible debentures were tendered so that General Host would own, together with its previously acquired shares, more than 50% of the outstanding Armour common stock, assuming conversion of all Armour debentures tendered. The final ratio of exchange was $60 principal amount of General Host debentures and 2½ warrants for each Armour share or for Armour debentures in the principal amount required upon conversion to obtain a share of Armour common stock. The Commissioners of the SEC declared the prospectus effective on January 30, 1969. The exchange offer expired on February 14, 1969.

General Host's offer met with hostility from Armour management. Armour's opposition was manifested even before the formal offer was advanced. Its counsel urged the SEC to investigate alleged securities law violations by General Host and sent the Commission several letters and memoranda in December and January pointing out purported defects in General Host's prospectus. Armour unsuccessfully sought a preliminary injunction in this Court, contending that the General Host registration statement was deficient, among other matters, in not indicating "the unlikelihood that General Host would be able to pay principal and interest as due, based on (1) the projected cash flow of General Host after the exchange offer; (2) the net tangible assets of General Host after the exchange offer; [and] the terms of the debentures . . . ." [7]

The evidence at this trial again demonstrated that:

"Armour's opposition was not limited to representations before official bodies. Through the month of January, 1969, while the registration was being processed, Armour publicly attacked the General Host proposal, and its views were widely disseminated. The news media, based on press releases issued by the Armour group, published the specific claims that it was very unlikely General Host would be able to pay principal and interest on the subordinated debentures; that the value of the warrants was illusory, and that the tax consequences to Armour stockholders would be adverse. A full-page advertisement addressed to Armour stockholders by the Chairman of the Armour board, published in the Wall Street Journal, The New York Times and other news media throughout the country, deni-

4. 15 U.S.C. § 78n(e) (1970).

5. § 17(a), 15 U.S.C. § 77q(a) (1970).

6. § 10(b), 15 U.S.C. § 78j(b) (1970).

7. *Armour & Co. v. General Host Corp.*, 296 F.Supp. 470, 473 (S.D.N.Y.1969).

grated the General Host securities and went into considerable detail as to the undesirability of the exchange. His statement raised questions whether General Host would have the cash flow necessary to service its greatly increased debt and touched upon other claimed deficiencies." [8]

Before the General Host registration statement became effective, a Greyhound subsidiary made a competing offer to Armour shareholders, a cash tender for Armour stock that was later increased to $72 per share of Armour common stock.

As a result of its exchange offer, General Host acquired about 55% of the outstanding Armour common stock, assuming conversion of the Armour debentures. Greyhound received approximately 32% of Armour common as a result of its cash offer and other purchases.

While the amended complaint contains many free-wheeling allegations of conspiracy and fraudulent conduct, at the trial the claims were narrowed to the two basic issues indicated: the adequacy of disclosure in the General Host prospectus disseminated to Armour shareholders concerning General Host's ability to meet its debt obligations from internal cash flow and impediments to its ability to obtain effective operating control of Armour.

█ The antifraud provisions of the securities laws prohibit the making of any untrue statement of a material fact or any omission to state a material fact "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." [9]

█ "Materiality" in the abstract is, of course, a meaningless concept. Materiality centers about the significance of the misstatement or omission of the fact under consideration to a reasonable investor's judgment in deciding to buy or sell. Thus, it can be given content only by considering all the circumstances surrounding the transaction.[10] The determination of materiality is to be made upon all the facts as of the time of the transaction and not upon a 20–20 hindsight view long after the event.[11] The ultimate issue is whether "any of the stockholders who tendered their shares would probably not have tendered their shares" had the alleged violation not occurred.[12]

█ The fact that the alleged violation occurred in the context of a hotly contested battle for control of a target company is a circumstance to be considered in determining whether there has been an actionable failure to disclose material facts.[13] In addition, the fact that there is a contest for control means that a failure to present information may be rendered harmless by disclosure from others, such as the target company, the competing tenderor or outside sources.[14]

---

8. *Armour & Co. v. General Host Corp.*, 296 F.Supp. 470, 474 (S.D.N.Y.1969).

9. § 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2) (1970); Rule 10b–5, 17 C.F.R. § 240.10b–5 (1974); § 14(e) of the Williams Act, 15 U.S.C. § 78n(e) (1970).

10. R. Jennings & H. Marsh, Securities Regulation 1129 (1972).

11. *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 363 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed. 2d 148 (1973).

12. *Electronic Specialty Co. v. Internat'l Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969); *General Time Corp. v. Talley Indus. Inc.*, 403 F.2d 159, 162 (2d Cir. 1968), *cert. denied*, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969).

13. *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 362–63 n. 14 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969); *General Time Corp. v. Talley Indus., Inc.*, 403 F.2d 159, 162 (2d Cir. 1968), *cert. denied*, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969); *McConnell v. Lucht*, 320 F.Supp. 1162, 1165 (S.D.N.Y.1970).

14. *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 606 (5th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974); *Chris-Craft Indus., Inc. v. Piper Aircraft*

A defendant may not be faulted for failure to repeat material information which has been publicly proclaimed in various ways on other occasions. The adequacy of disclosure of material information must be evaluated by a consideration of the "total mix" of all information conveyed or available to investors.[15]

The issue presented by this case, therefore, is not, as plaintiff myopically visualizes it, simply whether the General Host prospectus failed to state material facts, but whether Armour security holders were unable to make an informed investment decision because of alleged deficiencies in the prospectus, defects which, assuming any are found to exist, were never cured by information contained in other communications to Armour shareholders.

Plaintiff now argues that, of the two alleged defects in the prospectus, "the control problem was the most important aspect of the exchange offer." [16] However, the evidence reveals, and plaintiff's own amended complaint confirms, that the primary issue at the time of the exchange offer was General Host's ability to meet its debt obligations under the debentures to be issued to Armour security holders pursuant to the exchange offer. The control issue—whether or when General Host could get operating control of Armour—was subsidiary to this cash flow issue and but a part of it. Accordingly, plaintiff's two claims must be considered in this framework.

## CASH FLOW

Plaintiff argues that Armour security holders lacked material information concerning the exchange offer because the prospectus failed to disclose that General Host was not relying on its historical earnings, but upon management's projection of cash flow from operations, to meet its debt and service payments as they became due. Relative thereto, he further argues that Armour shareholders were inadequately advised of the risks involved in General Host's plan to acquire a majority of Armour's common stock.

The prospectus does not say that General Host intended to rely on its cash flow to meet its obligations. To the contrary, the prospectus refers to alternative methods by which General Host could raise cash to service debt during the period required to obtain control of Armour. It states that if there is no merger or consolidation and if General Host has not acquired more than 80% of Armour's stock, thus allowing it to effect tax saving arrangements, it may find it necessary or desirable to incur *new* indebtedness or issue *additional* equity securities. The prospectus also states that upon consummation of the exchange offer General Host may find it desirable to dispose of some of the assets held by it or Armour. Far from representing that General Host could meet its cash flow needs from internally generated funds, the prospectus discloses that it may be necessary or desirable to raise additional cash and sets forth alternative sources available to it.

In analyzing the adequacy of disclosure to Armour concerning General Host's cash flow, it is important to realize that the SEC prohibited the inclusion of earnings projections in a pro-

---

*Corp.*, 480 F.2d 341, 377, 401 (2d Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973).

15. *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, supra; *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 103 (10th Cir.), cert. denied, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed. 558 (1971) ; *Johnson v. Wiggs*, 443 F.2d 803, 806 (5th Cir. 1971) ; *Butler Aviation Int'l, Inc. v. Comprehensive Designers, Inc.*, 425 F.2d 842, 844 (2d Cir. 1970) ; *Hafner v. Forest Labs., Inc.*, 345 F.2d 167, 168 (2d Cir. 1965) ; *Winokur v. Bell Fed. Savings & Loan Assoc.*, 58 F.R.D. 178, 181 (N.D.Ill. 1972) ; *McConnell v. Lucht*, 320 F.Supp. 1162, 1165 (S.D.N.Y.1970) ; *Nicholson File Co. v. H. K. Porter Co.*, 341 F.Supp. 508, 521 (D.R.I.1972), aff'd, 482 F.2d 421 (1st Cir. 1973).

16. Plaintiff's Reply Brief at 2.

spectus. Plaintiff concedes that because of this Commission policy, General Host could not disclose its projected earnings. He argues, however, that it was materially misleading for General Host not to disclose that, on the basis of historical rather than projected earnings, it would not have adequate cash flow to meet its obligations under the debentures. This argument is without merit. The evidence refutes the claim that failing to disclose this item constitutes an omission to state a material fact "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." [17] Plaintiff's contention that General Host was required to state that historical earnings were inadequate for cash flow needs necessarily assumes that General Host had made a representation that it was relying on its cash flow to meet its cash requirements. As indicated, there was no such representation, express or implied, and the prospectus stated that General Host may find it desirable to do a number of things after the exchange offer to generate needed cash. The prospectus contained no statement as to cash flow that a reasonable investor would rely upon to his detriment absent the additional information suggested by plaintiff.

Though plaintiff concedes that General Host could not disclose projected earnings in the prospectus, he inconsistently argues that it should have informed Armour stockholders that it was relying on projected earnings, as opposed to historical results, to service its debt. To repeat, General Host never represented that it was relying on earnings, historical or projected, to meet its cash needs. To have stated, as plaintiff argues it should have, that it was relying on predicted future earnings to meet debt service needs would have been to make a projection that future earn-

ings would be adequate to meet General Host's cash obligations, and this of course it could not do. [18]

The fact was that General Host's internal study dated January 30, 1969, indicated that it would have sufficient cash flow, based on projected earnings and dividends of Armour stock at various levels of ownership, to meet its cash needs for the years 1969 and 1970. Plaintiff responds that this cash flow analysis was defective in that it omitted materials items, namely two debt obligations, and that consequently the prospectus was misleading in failing to disclose that General Host could not meet its debt obligations out of internally generated funds. Thus he contends that (1) the analysis did not account for repayments of $9.4 million due to various insurance companies on loans due in August 1969, and (2) it made no provision for capital expenditures which had amounted to $8 million in 1967 and $6 million in 1968. Neither of these arguments is well-founded.

The General Host cash flow study did not include repayment of the $9.4 million insurance company loans for the simple reason that General Host intended to refinance the loans. General Host had an opinion letter from the securities firm of Allen & Co. to the effect that if it had more than 50% of Armour's shares as a result of the exchange offer (which was the minimum level of ownership required for the exchange offer to be effective), there would be no difficulty in refinancing the loan. The prospectus stated that General Host "anticipated that [these loans] will be refinanced at the company's present borrowing rate." The evidence fully supports that statement.

As to the capital expenditure claims, plaintiff's argument that the prospectus did not reveal the impact of General Host's increased cash flow needs for its

---

17. *See* statutes cited note 9 *supra.*

18. Such a statement would also have been inaccurate, because while General Host thought its cash flow was adequate, it was not exclusively relying on it.

newly issued debentures on its capital expenditure program is refuted by the language of the prospectus:

> The Company proposes to continue its capital expenditures program during 1969 using funds to be derived from retained earnings and accumulated depreciation. There can, however, be no assurance this program will continue because it depends in part on funds to be generated by operations.

In addition to cash flow from operations, General Host had available several sources of funds, none of which required working control over Armour. Certain options were stated in the prospectus: General Host could sell part of its assets, incur new debt or issue additional equity securities. Others were available: General Host could call its $47,400,000 at 5% convertible subordinated notes due 1988 and, since the market price of its stock was above the call price, thereby force a conversion and eliminate interest on the notes; it could utilize a $6 million line of credit available to it; and it could enter into sale and leaseback arrangements concerning some of its plants, trucks and other vehicles to raise cash. All of these alternative sources of available funds were feasible.

As early as December 1968, counsel for Armour advised the SEC that in its opinion "the high debt-equity ratio of General Host (presently between four and five-to-one) raises important questions as to its sources of repayment of its large borrowings," and urged the Commission to require that the General Host prospectus "show rather explicitly the projected source of funds to service

new indebtedness . . . ." Despite these communications and meetings by the SEC staff with Armour's counsel in December 1968 and January 1969, the Commission itself, not the staff, declared the General Host registration statement effective. Although, as noted above, Armour specifically raised the matter before the SEC, the Commission made no request that General Host make any statement in the prospectus as to its ability to service its debt out of cash flow, either historical or as projected.

▪ While the registration of securities by the SEC does not constitute Commission approval of the language of the prospectus [19] and cannot relieve this Court of its duty to exercise an independent judgment on the adequacy of disclosure, clearance by the Commission in the face of charges identical with those presented here may be given some weight, [20] and the documentary evidence of arguments pressed by Armour's counsel upon the Commission makes this a particularly appropriate case in which to give some credit to the Commission's clearance.

▪ In addition to the Court's finding that General Host was not required to disclose that it was not relying on historical earnings to meet its cash flow needs to make the statements it did not misleading, the Court finds that Armour security holders were aware of the risks involved in General Host's ability to meet its cash needs from internally generated funds. Two direct mailings to Armour stockholders by Armour's Chairman of the Board raised the issue of the adequacy of General Host's cash flow.

19. 17 C.F.R. § 230.425 (1974).

20. *General Time Corp. v. Talley Indus., Inc.,* 403 F.2d 159, 163 (2d Cir. 1968), *cert. denied,* 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969) ; *Scott v. Multi-Amp Corp.,* 386 F. Supp. 44, 73 (D.N.J.1973) ; *Twentieth Century Fox Film Corp. v. Lewis,* 334 F. Supp. 1398, 1402 (S.D.N.Y.1971) ; *McConnell v. Lucht,* 320 F.Supp. 1162, 1166 (S.D.

N.Y.1970) ; *Armour & Co. v. General Host Corp.,* 296 F.Supp. 470, 475 (S.D.N.Y.1969) ; *Sherman v. Posner,* 266 F.Supp. 871, 874 (S.D.N.Y.1966) ; *Kauder v. United Board & Carton Corp.,* 199 F.Supp. 420, 423–24 (S.D.N.Y.1961) ; *Mack v. Mishkin,* 172 F. Supp. 885, 888 (S.D.N.Y.1959) ; *Dunn v. Decca Records, Inc.,* 120 F.Supp. 1, 2 (S.D. N.Y.1954).

In a letter of January 9, 1969, Armour shareholders were told that the pro forma combined statements of Armour and General Host in the prospectus "raise disturbing questions as to the ability of General Host to pay interest and amortization on its huge debt. Also, they do not take into account the fact that General Host estimates it will spend up to about $9 million in expenses in making the offer. Interest on this amount, which is almost 25% of General Host's net worth, would substantially reduce net income."

The letter continues by stating that the pro forma combined earnings figures in the General Host registration statement:

> "do not mean that General Host would have the cash flow necessary to service its greatly increased debt. For so long as there continue to be any public stockholders of Armour, even if General Host were in control of Armour's Board of Directors, . . . General Host could not use Armour's assets and cash flow—except by the declaration of dividends—to service General Host's indebtedness."

A second letter to Armour shareholders of February 10, 1969 advised that:

> "General Host already has a top-heavy debt structure, and would add up to $265,000,000 more if 80% of the Armour shares are acquired in the exchange offer. There is substantial doubt as to General Host's ability to meet its interest requirements, including interest on the proposed debentures.
>
> \* \* \* \* \* \*
>
> "General Host's pro forma operations simply will not generate enough cash to meet its interest requirements unless it can ultimately merge with Armour.
>
> \* \* \* \* \* \*
>
> "General Host states in its prospectus that it may find it desirable upon consummation of the exchange offer

to propose a merger with Armour, or to dispose of a portion of the assets presently held by it or by Armour, and that it . . . may find it necessary or desirable to increase the Armour dividend rate or incur new indebtedness or issue additional equity securities. Obviously, this is because without such action, General Host's indebtedness, including the debentures, might otherwise go into default.

> \* \* \* \* \* \*
>
> "General Host's exchange offer is now conditioned on its obtaining more than 50% of Armour. . . . If anything less than 100% is obtained, you should weight carefully the fact that Armour's cash flow and assets will not be available to service the debentures."

Both of these letters were also published as full page advertisements in the Wall Street Journal and The New York Times. These newspapers also carried other articles on the battle for control of Armour, in which Armour. is quoted as attacking the General Host offer as "financial hocus pocus" amounting to "a pyramiding of paper" on the "already overburdened debt structure of General Host," and as "meaningless balderdash" because General Host was unlikely to be able to pay the principal amount and interest on the debentures. One article reported that the Wisconsin Securities Commissioner denied General Host's application to register its securities in that state because its offer was "unfair and inequitable to the Armour stockholders because the cash flow of General Host appeared insufficient to cover the interest requirements on the debentures that would be outstanding if the exchange offer were successful."

General Host did not fail to disclose material facts concerning its ability to meet its future cash needs, and even assuming, *arguendo*, that additional disclosure was needed, the "total mix" [21]

---

21. *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 606 (5th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974).

of communications to Armour shareholders rendered any omission in the prospectus harmless.

## CONTROL

Intertwined with the issue of General Host's ability to meet its cash needs— whether through internal earnings, borrowings, equity offerings, sale of assets, use of bank lines of credit, sale and leaseback arrangements, or calling outstanding debentures—was the question whether and when General Host could gain operating control of Armour. If General Host could eventually secure 80% ownership of Armour's outstanding common stock, substantial tax savings would result. If General Host could later merge with Armour, it would have Armour's cash flow and assets available to it. General Host's ability to obtain operating control of Armour to effect tax savings, or to propose a merger of the two companies or to increase Armour's dividend, or to take other action, was an integral aspect of a dominant issue in the battle for control of Armour: General Host's ability to meet the interest payments of the debentures it was offering to Armour security holders.

Plaintiff contends that because the prospectus failed adequately to disclose the fact that Armour's Board of Directors is elected for staggered terms of three years and subject to cumulative voting, Armour shareholders were unaware of the obstacles involved in certain courses of action General Host contemplated. In other words, plaintiff asserts that because the prospectus did not contain a statement to the effect that the mere fact that General Host has more than 50% of Armour's stock does not mean that General Host has effective control, it created the impression that "General Host will be in a position to exercise operating control of Armour very soon after the tender to [General Host] of more than 50 percent of Armour's stock." [22] In sub-

stances, however variously stated, the argument runs that the prospectus was materially misleading because it failed to alert the Armour shareholders to the difficulties that stood in General Host's way before it could obtain effective control of Armour and its Board of Directors, since this was germane to General Host's capacity to meet its debt under the debenture issue and other obligations.

Discussion of plaintiff's argument requires distinguishing between two concepts: (1) stock ownership of more than 50% of Armour's common stock, which ordinarily would be termed a controlling *stock* interest, and (2) control of Armour's Board of Directors, which could result (a) from soliciting proxies and electing a majority of the Board of Directors—which in the case of Armour's staggered board and cumulative voting could take two years to accomplish, or (b) from General Host, as the holder of more than 50% of Armour's common stock, securing the working cooperation of a majority of the board, given the fact that eventual control of the board by General Host appeared to be inevitable. Clearly General Host's tender offer, which was conditioned on its owning more than 50% of Armour's common stock was for what would properly be termed a *controlling stock* interest. The prospectus does not represent, however, that upon successful completion of the exchange offer General Host would have *immediate operating control* of Armour. Plaintiff concedes that there is no such express representation. The language used, referred to hereafter, indicates that after the exchange, further action by General Host was required to get control, thus negating any view that immediate control would be achieved upon acquiring more than 50% of Armour's stock.

Initially, the prospectus advised Armour shareholders that Armour man-

---

22. Plaintiff's Post-Trial Brief at 3.

agement was hostile to General Host's offer:

"The present management of Armour has announced its opposition to the Exchange Offer in newspaper advertisements, in letters to Armour stockholders, in various press releases, in letters to financial institutions, in written and oral communications with various regulatory agencies and in a lawsuit commenced on January 23, 1969 in the United States District Court for the Southern District of New York."

The prospectus then describes a lawsuit against General Host brought by the Department of Justice in the Northern District of Illinois preliminarily to enjoin the exchange offer, stating that the Court rejected the government's theory that an earlier antitrust decree forbade "acquisition by General Host of a controlling stock interest in Armour." Then the prospectus states:

"General Host intends to act promptly both before and after consummation of the Exchange Offer to obtain control of the board of directors and management of Armour. In this connection it may engage in the solicitation of proxies for the election of directors of *Armour and other* matters, both at the February 21, 1969 annual meeting of Armour and Company and otherwise.

"General Host may find it desirable upon consummation of the Exchange Offer to propose to stockholders of the relevant corporations a merger or consolidation of it or its present or future subsidiaries with Armour or certain of its subsidiaries, or General Host may find it desirable to dispose of portions of the assets presently held by it or by Armour. If no such merger or consolidation

occurs, and if General Host has not acquired more than 80% of Armour's Common Stock, which would allow it to enter into tax-saving arrangements, General Host may find it necessary or desirable to increase the dividend paid on common stock by Armour, or to incur new indebtedness or issue additional equity securities."

On the next page, Armour security holders are directed to Annex A for information about Armour, which states that General Host:

"presently does not participate in the direction or management of Armour. To the best knowledge of General [Host] there are presently 17 directors of Armour. The terms of 6 directors expire in 1969, 5 in 1970 and 6 in 1971. In addition, Armour has cumulative voting."

Plaintiff argues that Armour's staggered Board of Directors and the cumulative voting provision, which could present an obstacle to General Host's acquiring immediate operating control of Armour, was not sufficiently highlighted or emphasized but instead was "buried" in the section of the prospectus describing Armour. However, the suggestion that Armour security holders were misled or unaware of these facts about Armour during the pendency of the exchange offer because of the manner of their presentation in the General Host prospectus disregards the factual situation.

The prospectus was addressed to Armour security holders, and this circumstance affects the extent of disclosure required of General Host concerning publicly available information about Armour.[23] As our Court of Appeals has stated:

"The securities laws impose upon an offeror of an exchange offer a duty

23. *See Titan Group, Inc. v. Faggen,* 513 F.2d 234 (2d Cir. 1975) ; *Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 873 (2d Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974) ; *SEC v. Coffey,* 493 F.2d 1304, 1313 (6th Cir. 1974), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975) ; *Arber v. Essex Wire Corp.,* 490 F.2d 414, 419–20 (6th Cir. 1974), *cert. denied,* 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1975) ; *City Nat'l Bank v. Vanderboom,* 422 F.2d 221, 231 (8th Cir.), *cert.*

to act reasonably in discovering facts material to the offer as of the time of the transaction and in disclosing fully those *material facts of which the offeree is presumably unaware* and which ostensibly would influence his judgment. [Citation omitted.] Corporate officers have a reasonable area of discretion in determining how far to explore the facts and in deciding what facts need to be disclosed."[24]

Armour shareholders presumably were aware of their company's staggered board and cumulative voting, and the prospectus sufficiently disclosed this information in light of the circumstances existing at the time of the offer.[25]

Entirely apart from the prospectus, however, Armour shareholders were otherwise advised of the characteristics of their Board of Directors. On January 9, 1969, Armour shareholders were sent the previously indicated letter which criticized the General Host offer even before it had been made. This letter reminded the shareholders that Armour's board was "classified and elected for three-year terms." On January 17, 1969, Armour shareholders again had this information called to their attention when Armour management sent shareholders a proxy statement advising them that six of Armour's seventeen directors would be elected for three-year terms at the February 21, 1969 annual shareholders' meeting and that cumulative voting would be used. On February 10, 1969, Armour shareholders received another direct mailing, a supplemental proxy statement reiterating that six three-year directorships on the seventeen-man board of directors were up for election. The supplemental

proxy stated that while General Host intends to propose candidates for election as directors, Armour management continues to solicit proxies for the six incumbent directors and "intends to vote its proxies so as to elect as many of such nominees as possible under cumulative voting." Far from being misled, Armour shareholders were thus inundated with information concerning their own corporation's staggered board and its cumulative voting provision. The bombardment of the Armour shareholders by communications and publications hardly suggests that they were misled into believing that General Host would achieve immediate control of Armour's Board of Directors if it obtained more than 50% of Armour shares. To the contrary, it was manifest that even if General Host acquired a majority of the stock, the battle for operating control would continue for a period.

Plaintiff also asserts that the prospectus in the two paragraphs quoted above (beginning with "General Host intends to act promptly . . .") failed to emphasize the staggered board as an obstacle to General Host's acquiring immediate operating control of Armour, and thereby misled the Armour shareholder into believing that the various possible alternative courses discussed in the second paragraph would be unqualifiedly available to General Host merely upon completion of the exchange offer, when General Host would have acquired more than 50% of Armour's common stock. In this connection he stresses (1) statements made by General Host's president, Harris J. Ashton, in an affidavit of January 23, 1969, filed in opposition to the government's motion in the Illinois action for

---

denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed. 2d 560 (1970); *Myzel v. Fields*, 386 F.2d 718, 736 (8th Cir. 1967), cert. denied, 390 U. S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *Kohler v. Kohler Co.*, 319 F.2d 634, 641–42 (7th Cir. 1963); *Gulf & Western Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 356 F.Supp. 1066, 1071–72 (S.D.N.Y.), aff'd, 476 F.2d 687 (2d Cir. 1973).

24. *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 369 (2d Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973) (emphasis supplied).

25. Cf. *Gulf & Western Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 356 F.Supp. 1066, 1071 (S.D.N.Y.), aff'd, 476 F.2d 687 (1973).

a temporary restraining order and injunction against General Host's proposed exchange offer, and (2) statements from General Host's "Confidential Report on Armour and Company," referred to as the "Black Book," prepared in October 1968.

This argument overemphasizes essentially one paragraph from the entire prospectus and ignores the paragraph immediately preceding it, other statements in the prospectus, direct communications by Armour management to its shareholders, "all the circumstances" surrounding the exchange offer, and the conduct of those parties who opposed General Host's offer and had the greatest interest in exposing any misstatements in the prospectus and emphasizing the weaknesses of the offer.

The prospectus does not state that General Host will have operating control of Armour upon consummation of the exchange offer. Rather, after relating in some detail Armour management's opposition to the offer, it states that "General Host intends to act promptly both before and after consummation of the Exchange Offer to obtain control of the board of directors and management of Armour," and that in this regard "it may engage in the solicitation of proxies for the election of directors of Armour *and other matters,* both at the February 21, 1969 annual meeting of Armour and Company *and otherwise"* (emphasis supplied). Plaintiff interprets this language as an implicit representation that General Host will obtain immediate effective control of Armour through the solicitation of proxies for the election of directors of Armour at the February 21, 1969 annual meeting. The prospectus, however, makes it clear that General Host's attempts to gain operating control will require more than the solicitation of proxies at the next annual meeting, as Armour shareholders were well aware from the contemporaneous Armour proxy solicitations already described.

Despite plaintiff's selective editing of various sentences in the Ashton affidavit, its tone and emphasis is consistent with the prospectus language, and this is unquestionably so when viewed in its proper context. The affidavit was submitted in opposition to a motion for *preliminary* injunctive relief. A fair reading of the entire affidavit reveals that General Host's argument to the District Court in Illinois was that the government's request for preliminary relief "should be denied at this time as premature" because General. Host's exchange offer to acquire a majority of Armour's stock may be unsuccessful; even if successful, it will not in and of itself give General Host operating control of Armour; and it will not effect a merger of the two companies, but rather will leave them separately engaged in their separate businesses. It emphasizes that "until the result of the exchange offer is known" there would appear to be no question for the Court to decide and concludes by arguing that because various overt steps would have to occur before the assets of the two companies would be combined, "no prejudice to the Government's position will occur by reason of General Host's exchange offer." The affidavit does not support plaintiff's theory that General Host believed control was necessarily a long way off, but is instead directed to General Host's claim that no irreparable injury to the government will result from the exchange offer itself and therefore preliminary injunctive relief was not warranted—in sum, that even if the exchange offer were successful, and thereupon General Host moved forward to obtain operating control, ample time still remained for the government, based on the changed situation, to reapply for injunctive relief.

Similarly, the General Host study of Armour, far from indicating that General Host was secretly preoccupied with grave concern over the legal obstacles of a staggered board, gives the staggered board situation no greater em-

phasis than the prospectus itself, and undisputedly no greater emphasis than Armour management did in its determined efforts to defeat the exchange offer.

Putting this paragraph to one side, plaintiff focuses primarily on the next one, arguing that it materially misleads Armour shareholders because some of the actions General Host "may find it desirable" to take require operating control of Armour's board, such as selling certain of Armour's assets or increasing Armour's dividend. These actions would have required the cooperation of Armour's board, and General Host understood this when the prospectus was issued. Other actions mentioned in the paragraph did not, such as selling certain of General Host's assets, incurring new indebtedness or issuing additional equity securities. Plaintiff's argument has force only if the preceding cautionary paragraph and the surrounding circumstances of the offer are ignored.

General Host not unreasonably expected that upon its acquisition of more than 50% of Armour's stock, the Armour directors would recognize that eventual control by General Host was inevitable and would cooperate with it. Certainly this expectation was justified from the standpoint of a director's duty to serve the interests of its stockholders, with General Host being the majority stockholder, and from the view of the Armour directors who were also officers of the company and whose positions were dependant upon good relations with the board of directors, control of which at some point would pass to General Host. Indeed, as this Court observed during the trial, it is a fact of corporate life that when the smoke of battle for control clears, the losing management perforce recognizes its basic responsibility and fiduciary duty to shareholders.

Other possible ways of obtaining operating control were likely. With General Host owning more than 50% of Armour's common stock, some Armour directors might resign; Greyhound, realizing it was holding a minority block of stock in a company General Host would eventually control, might agree to sell its shares to General Host; or General Host, acting on the opinion of Delaware counsel, as a majority shareholder could move to amend Armour's by-laws to increase the number of directors and thereby gain a majority of the board. These were not illusory, but feasible, practical methods whereby effective working control of Armour might have been achieved.

Plaintiff responds that if this were General Host's contemplated plan, it was required to disclose its predictions and hopes as to the attitude of Armour's directors should the offer be successful. Perhaps General Host could safely have said more about its expectations, but given Armour management's hostility during the struggle for control, and the fact that General Host's expectations were based not so much on specific facts as on a realistic business judgment as to what *might* happen after a successful exchange offer, such predictions by General Host could themselves have been misleading. It would have been as wrong to overstate the definiteness or likelihood of what might happen as to understate it.[26] Unless tender offers are to become something akin to walking across a minefield in which the slightest misstep means substantial liability for the offeror, it cannot be said that General Host exceeded "a reasonable area of discretion . . . in deciding what facts need to be disclosed." [27]

Armour shareholders were aware that the exchange offer, in and of itself, would not give General Host complete control over Armour's assets and cash

26. *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969).

27. *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 369 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed. 2d 148 (1973).

flow. As indicated above, shareholder mailings of January 9 and February 10 emphasized that unless General Host obtained 100% of the Armour shares, it could not use Armour's assets and cash flow to service General Host's indebtedness.

In determining whether Armour security holders were materially misled by the prospectus, account may be taken of the relatively lesser importance of what General Host might find it desirable to do *if* the exchange offer were successful as opposed to the central issue of General Host's ability to service the debt on the debentures it was offering to Armour shareholders. Materiality, as already noted, is not an abstract concept to be decided in a vacuum. It must be determined upon a realistic appraisal of the facts and events related to the transaction at issue. Realistically, "the only truly objective evidence of the materiality" of the alleged omissions [28] in the prospectus under all the circumstances *then* existing is the importance then given them by those with the greatest interest in defeating the offer—the incumbent Armour management.[29] This is particularly so here since at that time Armour's highly experienced counsel scrutinized the General Host registra-

tion statement with microscopic care and dredged up every conceivable deficiency of the proposal.[30] The arguments made by Armour's counsel to the SEC and to this Court attacking the adequacy of disclosure in the prospectus, Armour management's letters to Armour shareholders, its advertisements in the newspapers, its statements to the press, and various newspaper articles at the time of the offer establish far more convincingly than plaintiff's arguments six years after the event that General Host's future plans for Armour after a successful tender offer were not the overriding factor in an Armour shareholder's decision whether to accept the General Host offer. Plaintiff's present claim that the obstacles of the staggered board and cumulative voting should have been highlighted stands in marked contrast to the relatively insignificant importance given this issue during the actual battle for control of Armour.[31]

■ Finally, plaintiff argues that the pro forma combined financial statements of Armour's and General Host's operations were materially misleading because the prospectus failed to disclose what plaintiff contends was the "assumption" upon which they were based, that General Host would obtain imme-

---

**28.** *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 851 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed. 2d 756 (1969).

**29.** *Cf. Sonesta Int'l Hotels Corp. v. Wellington Assoc.*, 483 F.2d 247, 255 (2d Cir. 1973) ; *General Time Corp. v. Talley Indus., Inc.*, 403 F.2d 159, 162–63 (2d Cir. 1968), *cert. denied*, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed. 2d 570 (1969) ; *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 851 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

**30.** *See Armour & Co. v. General Host Corp.*, 296 F.Supp. 470, 474 (S.D.N.Y.1969).

**31.** For example, when Armour's counsel sent a memorandum to the SEC in January 1969 arguing that a preliminary prospectus was misleading, it summarized its contentions as follows :

"In a transaction as complex as this, we would think the prospectus should have at the very beginning an introduction contained the salient features and highly speculative aspects of the offering. These are the antitrust problems and the magnitude and effect of possible divestitures by General Host including the resulting lack of significance of pro forma combined figures ; the relative sizes of the two companies ; the inordinately large amount of debt which General Host will incur and how it will be serviced ; the fact that, at least until the corporations are merged, the indebtedness of General Host will be junior to that of Armour including its subordinated debentures and preferred stock. Obviously these factors make acceptance of the exchange offer a very risky business."
Armour's staggered board was given but a fleeting reference.

diate effective control of Armour. However, the pro formas were included in the prospectus not because General Host made a number of undisclosed assumptions or because it thought that these statements would somehow improve the apparent value of its offer to Armour shareholders, but simply because their inclusion was required by the SEC.

Plaintiff contends, however, that there is something inherently suggestive about pro forma consolidated statements and argues that they should have been preceded by cautionary wording, such as: "General Host may not be able to obtain operating control of Armour unless it can elect a majority of the board of directors of Armour."[32] Yet there is little difference between this language and the language General Host did use: "General Host intends to act promptly both before and after the consummation of the Exchange Offer to obtain control of the board of directors and management of Armour." Moreover, the language of the prospectus introducing these pro formas clearly indicates that the statements were the result of combining the two companies' operations, and does not lend itself to plaintiff's interpretation that the statements created the "impression" that upon consummation of the exchange offer, General Host would have Armour's assets and cash flow available to it.[33] Plaintiff does not dispute the fact that the pro formas were required to be in the prospectus, nor does he allege that they were inaccurate in any respect. Given the cautionary language that the

exchange offer in and of itself would not deliver operating control of Armour to General Host and the absence of any affirmative misrepresentation to this effect, defendants cannot be held liable because of plaintiff's "impressions" which are not fairly supported by the language of the prospectus.

Plaintiff's various arguments concerning General Host's alleged omissions in not giving greater emphasis to the characteristics of the Armour board and to the fact that the ownership of more than 50% of Armour's stock would not per se give it operating control are all based on the notion that General Host was in some way subtly trying to create impressions in the minds of the Armour stockholders contrary to publicly known facts about their company. This is not the type of claim common to tender offer actions, where it is usually alleged that the offeror failed to disclose material facts about itself with which the offerees could not be expected to be familiar.[34] General Host was required by SEC regulations to "describe any plans or proposals" which it may have, *inter alia,* to sell the assets of Armour, merge it with General Host, or make any other major changes in its business.[35] As another court so aptly pointed out in the context of proxy disclosure, "[d]ifficult decisions must be made as to what information to place toward the beginning and what to place further toward the end [of the document], what to emphasize and what to state more blandly. It is, of course, impossible to emphasize everything, and every fact can not be contained in the beginning." Exchange offerors must be fair to the needs of

---

32. Plaintiff's Post-Trial Brief at 23.

33. Again, the two Armour management shareholder mailings specifically negated any "impression" plaintiff received from viewing these pro formas.

34. *See, e. g., Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 367 (2d Cir.) *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); *Sonesta Int'l Hotels Corp. v. Wellington Assoc.,* 483 F.2d 247, 249–50 (2d Cir. 1973).

35. SEC Rule 14d–1(c)(4) and Schedule 13D, 17 C.F.R. §§ 240.14d–1(c)(4), 240.13d–101 (Item 4). "It would be as serious an infringement of these regulations to overstate the definiteness of the plans as to understate them." *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 948 (2d Cir. 1969).

shareholders for relevant information, but courts cannot require that they be "clairvoyant." [36]

■ Plaintiff by his various suggestions of precise language would reword the prospectus so as to have exposed, as he now envisions them, the alleged deficiencies of the tender offer, most of which were highlighted and repeatedly brought to the notice of Armour shareholders during the course of the bitter struggle for control by Armour itself, the target company—in effect, his suggestions of rewording would have required General Host to denigrate its very offer to shareholders. "Courts should tread lightly in imposing a duty of self-flagellation on offerors with respect to matters that are known as well, or almost as well, to the target company." [37] While courts must rigidly enforce the requirement that investors be fully and completely informed as to material matters, there is no requirement that information already adequately disclosed be spoonfed to them.

■ Under all the circumstances then existing, including the acknowledged hostility of Armour management, its mailings to shareholders and its contemporaneous solicitation of proxies for Armour's upcoming shareholder meeting, the prospectus was not materially misleading on the prospect of General Host's eventually acquiring control of Armour after the exchange offer.

## CONCLUSION

In rejecting plaintiff's claims, however variously stated, concerning the adequacy of disclosure on the issues of cash flow and the prospects for control, the Court is required to preserve a delicate balance between the needs of Armour security holders for fair and adequate disclosure of material facts necessary for an informed investment decision and the need for a reasonable amount of discretion that offerors must have if the making of exchange offers is not to degenerate into a game of "Russian roulette". It is well to keep in mind Judge Friendly's characteristically cogent observation:

"Probably there will no more be a perfect tender offer than a perfect trial. Congress intended to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make [the Williams Act] a potent tool for incumbent management to protect its own interests against the desires and welfare of the stockholders. These considerations bear on the kind of judgment to be applied . . . on the issue of materiality." [38]

The General Host prospectus may not have been perfect; no doubt it could have been improved, but it was not materially misleading. It did not misrepresent or state in a misleading fashion, nor did it omit to disclose, any fact which might or would have been important to the decision of a reasonable investor with regard to the exchange offer.

The foregoing, together with the facts stipulated by the parties, shall constitute the Court's Findings of Fact and Conclusions of Law.

Judgment may be entered for the defendants.

36. *Smallwood v. Pearl Brewing Co.*, 489 F. 2d 579, 602 (5th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974).

37. *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 873 (2d Cir.), *cert. de-* nied, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974).

38. *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969).